## JOPLIN GAS CO. v. PUBLIC SERVICE COMMISSION OF MISSOURI et al.

(District Court, W. D. Missouri, S. W. D. February 28, 1924.)

1. Gas ⬤⟹14(1)—Rate basis fair value of property.

In determining what will enable a gas company to earn a fair return, its property used is to be taken at its fair value at the time the rate is in force.

2. Gas ⬤⟹14(1)—Basis of rates fair value of property, though increased by war prices.

Under the rule that the present fair value of the property of gas company used in the public service is to be taken as the basis for fixing reasonable returns, the company is entitled to such value, even though it has been increased as the result of enhanced war prices.

3. Gas ⬤⟹14(1)—Allowance for depreciation required in valuation for rate making.

Neither the original cost nor the present cost of reproduction is always a fair measure of the present value of the physical property of a gas company for rate-making purposes; but, where the plant has been in use for a number of years, an allowance must be made from either cost for depreciation.

4. Gas ⬤⟹14(1)—Immaterial that increased rates burdensome to consumers.

A contention that an increase in rates would be unjustifiably burdensome to consumers of gas has no weight in the determination as to what will bring a fair return to a public utility for service rendered.

5. Gas ⬤⟹14(1)—Conclusions of commission as to gas rates not binding on courts.

Conclusions of Public Service Commission as to gas rates are not binding on the courts in an action to set aside an order fixing rates as reasonable and confiscatory, though they are entitled to great respect.

6. Gas ⬤⟹14(1)—Rate order of commission considered from standpoint of period with which it deals.

In a suit to set aside an order of a Public Service Commission fixing gas rates as unreasonable and confiscatory, the order of the commission will be considered from the standpoint of the period with which it deals, and where the commission has acted fairly, and its decision is reasonable, the parties should be left to a seasonable application for redress under changed circumstances before the commission itself.

7. Gas ⬤⟹14(1)—Allowance of 35 per cent. for leakage excessive.

In a proceeding to fix gas rates, an allowance of 35.28 per cent. for leakage would be excessive.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. Constitutional law ⊕⟹70(1)—Making of rates a legislative function.**

The making of rates to be charged consumers by a gas company or other public utility is a legislative and not a judicial function, and a court is without jurisdiction to change rates fixed by a legislative body; but it is within the power of the court to afford temporary relief by declaring an order of a Public Service Commission fixing a rate to be unreasonable and confiscatory.

In Equity. Bill by the Joplin Gas Company against the Public Service Commission of the State of Missouri and others to set aside an order of said Commission. Decree for plaintiff.

George J. Grayston, of Joplin, Mo., and Leslie J. Lyons, of Kansas City, Mo., for complainant.

L. H. Breuer, of Rolla, Mo., and Lee Bond, of Leavenworth, Kan., for defendants.

VAN VALKENBURGH, District Judge. Beginning with November 1, 1920, the Public Service Commission of the state of Missouri established for the Joplin Gas Company a rate of 70 cents per 1,000 cubic feet of gas consumed, payable monthly, with a 10 per cent. penalty clause; that rate continued in effect until the temporary order of this court, entered November 7, 1923, to which reference will be made hereafter. The Joplin Gas Company obtains its gas for distribution from the Kansas Natural Gas Company, and the rate charged for gas delivered at the city gate was 33 cents per 1,000 cubic feet until April 1, 1922. February 16, 1922, the Kansas Natural Gas Company notified the Joplin Gas Company that on and after April 1, 1922, the rate for all gas delivered at the town border would be 40 cents per 1,000 cubic feet. On May 24, 1922, the Joplin Gas Company filed its petition with the commission for authority to increase its rate for gas from 70 cents to 77 cents per 1,000 cubic feet to meet the increased rate to it imposed by the Kansas Natural Gas Company. The case was submitted November 2, 1922, and decided May 17, 1923. Motion for rehearing was overruled July 19, 1923. The commission refused to increase the rate to be charged to consumers, and by its order established the rate of 70 cents per 1,000 cubic feet, with a 10 per cent. penalty clause as theretofore.

September 12, 1923, the Joplin Gas Company filed its bill in this court, praying that said order of the commission be set aside on the ground that the rates thereby established were unreasonable and confiscatory. November 1, 1923, a hearing upon said application was held before a court composed of three judges, and a temporary injunction was granted. Pending final hearing, a rate of 77 cents was made effective, with provisions for refund in case the prayer of the petitioner should ultimately be denied. At that hearing it was the unanimous opinion of the judges sitting that the rate imposed by the Public Service Commission and attacked by the bill was unreasonably low under the facts submitted at the preliminary hearing. The trial, before the writer of this memorandum, has served in no wise to alter the opinion then formed, but, on the contrary, has fortified and confirmed it. It is proper, if not necessary, to point out the reasons which have led to this conclusion.

⊕⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The manner in which the commission arrived at the sum of $600,000 as the value of the property of the Gas Company, used and useful, as a basis for the computation of return, is epitomized in the following table:

| | | |
|---|---:|---:|
| Estimated investment cost as found by the commission's engineers | | $683,900.00 |
| Deduct: | | |
| Land | $ 4,645.00 | |
| Materials and supplies | 14,822.00 | |
| Cash working capital | 21,000.00 | 40,467.00 |
| | | $643,433.00 |
| Add 50 per cent. to cover increase in prices | | 321,716.00 |
| | | $965,149.00 |
| Deduct depreciation, 46 per cent | | 443,969.00 |
| | | $521,180.00 |
| Restore deductions shown above | | 40,467.00 |
| | | $561,647.00 |
| Add going value, 5.7 per cent | | 32,014.00 |
| Total value | | $593,661.00 |

After a full and careful consideration of all of the evidence in this case, it appears that the fair present value of petitioner's property used and useful in the public service, including all elements of value, tangible and intangible, is the sum of $600,000, as of date June 30, 1922.

The commission then took the following statement of operations of the company for the purpose of arriving at the amount available for return, surplus, and contingencies:

| | Statement No. 2, Year 1921. | Statement No. 4, First Six Months 1922. |
|---|---:|---:|
| Operating revenues | $301,335.34 | $162,204.84 |
| Operating expenses (not including depreciation) | 250,911.29 | 123,447.71 |
| Available for depreciation and return | $ 50,424.05 | $ 38,757.13 |
| Deduct, if meter installation fee be discontinued. | $    665.00 | $    307.50 |
| Deduct, if taxes be finally paid at $2.46 rate | 1,901.34 | 950.77 |
| | $ 47,857.71 | $ 37,498.85 |
| Add excess of purchase price over revenue from boiler gas | 4,812.53 | .......... |
| | $ 52,670.24 | $ 37,498.85 |
| Deduct repairs to mains | 2,142.40 | 123.34 |
| | $ 50,527.84 | $ 37,375.51 |
| Deduct annual depreciation allowance, P. S. C. engineer's appr. | 23,322.00 | 11,661.00 |
| Available for return, surplus and contingencies | $ 27,205.84 | $ 25,714.51 |
| Percentage return on $600,000 | 4.53 | |

The conclusion of the commission as to percentage of return is then summarized in the following language:

"During the year 1921, the company purchased 614,558,000 cubic feet of gas, sold 397,191,500 cubic feet, and used 516,800 cubic feet. The gas lost and unaccounted for during the year was 216,849,700 cubic feet, which is equivalent to 35.28 per cent. That this leakage is grossly excessive is shown later. On the basis of a reduction in leakage from 35.28 per cent. to 15 per cent. and an increase in the rate for gas at the city gates to 40 cents per thousand cubic feet, the operating expenses for the calendar year 1921 would have been reduced approximately $12,190, and the company would have had $39,395.84, instead of $27,205.84, available for return, surplus, and contingencies on $600,000."

The commission thus estimates that, upon the value fixed by it, the amount available for return, surplus, and contingencies, would yield a net income for return of 6.56 per cent. The report of the Commission's accountants showed that the total cost of plant and equipment, as shown by the company's books, as of June 30, 1922, is $964,818.09. This amount was reduced to $854,822.11 through adjustments made by said accountants, excluding property deemed not to be used in the public service. The commission also, in effect, rejected the value of $854,-822.11, considering the item to be of little value, for the reason that it consisted, in part, of an unverified charge, to plant account, in the amount of $449,461.48. Its accountants then proceeded to arrive at the cost of the property from such vouchers and records as were obtainable, and by estimates as to all remaining items. The figure arrived at was $683,900. To this estimated cost of production the commission sought to apply the reproduction theory, less depreciation, in accordance with percentages accepted by it as controlling, arriving at the result disclosed by the table first herein above set forth.

The complainant challenges the computations of the commission, and the resulting incidents of rate and return, upon the following grounds:

(1) The fixed value of the property is unreasonably low.

(2) The allowance of 50 per cent. to cover increase in prices is too low. The increase, as shown by authoritative reports of statistics, conceded to be accurate by the commission's accountants, being 69.7 per cent. over the year 1913, universally accepted as a basis. This standard is supplemented by an exhaustive analysis of the trend of prices of material and cost of labor by complainant's accountants, who fixed the percentage of increase at a still higher rate. Elaborate exhibits are presented in corroboration of this testimony.

(3) Complainant urges that the 46 per cent. of depreciation charged is too high; actual exposures and examinations showing, as they contend, a depreciation of only 23 per cent.

(4) The percentage of going value, to wit, 5.7 per cent., is too low; 10 per cent., at least, being reasonable.

(5) The cash working capital of $21,000 or one month's income, should be increased to the income of two months, or $42,000.

(6) The limitation of allowed leakage to 15 per cent. is unreasonable and impossible of realization. It is also contended, and at the hearing conceded by an accountant for the commission, that in the commission's estimate of $39,395.84 available for return, surplus, and con-

tingencies the item of $4,812.53 was again included, indirectly, at least, in the amount charged against the company for the reduction of leakage. This would leave only $34,583.31 available for return, or a percentage of 5.76 per cent. upon a valuation of $600,000, according to the commission's own corrected estimate. This last contention of complainant must be sustained upon the undisputed testimony.

[1-3] Before entering upon a brief analysis of the several points in controversy, some general principles of law should be recalled and restated. In determining what rate will enable a gas company, or other public utility, to earn a fair return, its property used is to be taken at its fair value at the time the rate is in force. Under the rule of the Supreme Court that the present fair value of the property of a gas company used in the public service is to be taken as the basis for fixing reasonable rates, the company is entitled to such value, even though it has been increased as the result of enhanced war prices. Neither the original cost nor the present cost of reproduction is always a fair measure of the present value of the physical property of a gas company for rate-making purposes; but, where the plant has been in use for a number of years, an allowance must be made from either cost for depreciation. City of Minneapolis v. Rand et al. (C. C. A.) 285 Fed. 818.

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." Bluefield Co. v. Public Service Commission, 262 U. S. 679, 692, 693, 43 Sup. Ct. 675, 679 (67 L. Ed. 1176).

[4] In determining what will bring a fair return to a public utility for service rendered, we are not permitted to start out with the fixed notion that existing rates must under no circumstances be disturbed, any more than we may indulge the view that an extravagant return must be granted merely because it is asked for. It is probably true that there is a limit to the price that should be exacted for necessities required by the public; but this view has no place in the determination of what private purveyors are entitled to receive in return for services and commodities rendered and furnished. In general, business self-interest will ordinarily safeguard the public from the exaction of prices so unreasonable as to be prohibitive. At any rate, it may be assumed that no private party will ever be required to furnish at a loss, or for an unreasonable return. Such a situation will necessarily result in withdrawal of capital from such unprofitable investments; then the alternative must be public ownership, under which the loss, if inevitable, will be transferred to and absorbed by the people at large. But we are not dealing with such a situation, and these remarks are injected to meet the insistence that an increase in rates would be unjustifiably burdensome to consumers.

[5] The commission, in this case, has given a careful and conscientious consideration to both facts and law. It has carefully considered the rules laid down by the courts as it has viewed them. The question is whether all its deductions are sound in view of the condition here presented. Its conclusions are entitled to great respect; they are not binding upon the courts, however, and the question is not whether the commission did the best it could, but whether what it did can stand. Incidentally, it is unsafe and inconclusive to resort to the findings of the courts, arrived at in widely differing cases and under widely differing facts, for the purpose of adopting percentages as fixed standards. In some cases such courts have fixed the percentages of appreciation, depreciation, and return as reasonable and applicable to the case then before them, but not necessarily applicable and reasonable in other cases. On other occasions, they have accepted percentages found and established by masters and trial courts, because the facts before them did not warrant the disturbance of such findings. In Lincoln Gas Co. v. City of Lincoln, 250 U. S. 256–268, 39 Sup. Ct. 454, 63 L. Ed. 968, the court declined, on the facts of that case, to approve a finding that no rate yielding as much as 6 per cent. on the invested capital could be regarded as confiscatory. Mr. Justice Pitney said:

"It is a matter of common knowledge that, owing principally to the World War, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted, and largely since this cause was last heard in the court below. And it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future."

In City of Minneapolis v. Rand et al., supra, the Circuit Court of Appeals for this circuit sustained, as against the attack of the city on the ground that it was excessive, 7½ per cent., found by a special master and approved by the District Court, as a fair and reasonable return on the capital invested. In Bluefield Co. v. Public Service Commission, supra, Mr. Justice Butler says:

"What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts."

He notes with approval the decision of the Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 50, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, which—

"held that the question whether a rate yields such a return as not to be confiscatory depends upon circumstances, locality and risk, and that no proper rate can be established for all cases, and that, under the circumstances of that case, 6 per cent. was a fair return on the value of the property employed in supplying gas to the city of New York, and that a rate yielding that return was not confiscatory. In that case the investment was held to be safe, returns certain and risk reduced almost to a minimum—as nearly a safe and secure investment as could be imagined in regard to any private manufacturing enterprise."

Reference has been made by counsel for defendants to the opinion of the Supreme Court in Dayton-Goose Creek Railway Co. v. United

States et al., 44 Sup. Ct. 169, 68 L. Ed. ——, decided January 7, 1924, and not yet [officially] reported, as recognizing generally the sufficiency of a 6 per cent. return. That case falls far short of sustaining such a contention. In the first place it is dealing with railroads, nation-wide utilities, and with a purpose to insure safe and certain returns, but to limit the rates for such service in accordance with well-established rules of supervision and control by the Interstate Commerce Commission. Mr. Chief Justice Taft cites the Bluefield Case, the Willcox Case, Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, and Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244, and then says:

"Thus the question of the minimum of a fair percentage on value is shown to vary with the circumstances. Here we are relieved from considering the line between a fair return and confiscation, because under the provisions of the act and the reports made by the appellant the return which it will receive after paying one-half the excess to the Commission will be about eight per cent. on the reported value. This can hardly be called confiscatory. Moreover, the appellant did not raise the issue of confiscation in its bill, and it cannot properly be said to be before us."

[6] It will be noted that the rates complained of were put in effect in November, 1920. The preliminary hearing in this court was in November, 1923, and the final hearing in February, 1924. The suggestion has been made by complainant that this court, in deciding justly, and especially in the light of experience of months of operation and experiment, as it were trying the case de novo, may take into consideration, as to cost of reproduction, etc., the situation at the time of the hearing before it, instead of that at the time of the hearing before the commission. There is force in this suggestion, and with respect to resulting operations and returns it will be indulged under uniform decisions approving such a practice; but as to valuations, and matters of a kindred nature, entering into the calculations of the commission, I prefer to consider an order of the commission from the standpoint of the period with which it deals; otherwise, courts may, at any time, be called upon plausibly to review and to overturn the orders of commissions, although based soundly upon the matter before them at the time. This would practically destroy the usefulness of such commissions and the purpose for which they were established. It would cast an undue burden upon the courts. Where a commission has acted fairly, and its decision is reasonable, the parties should be left rather to a seasonable application for redress under changed circumstances before the commission itself.

Turning, now, to the specific criticisms made by complainant, I find from the evidence that the percentage of 50 per cent. to cover increase in prices for reproduction purposes is too low. In my opinion, that percentage should approach more nearly 69.7 per cent., which is the percentage of increase recognized by the trade and practically conceded by one of the accountants for the commission. Applying this percentage, and accepting otherwise the figures of the commission, the value of the property for return, etc., would be $676,581; and accepting the commission's figure of $39,395.86, available for return, surplus, and contingencies, the rate of return would be 5.8 per cent.;

adopting the corrected figures of $34,583, available for return, etc., the return would be a little more than 5.1 per cent. But it was shown in the testimony that 31 per cent. of the plant was constructed before 1905; that 43 per cent. was constructed during the years 1906, 1907, and 1908; that 12 per cent. was constructed between the years 1918 and 1920; and 14 per cent. at various times between 1908 and 1918. It would appear, therefore, that 81 per cent., approximately, was constructed at a period to which the highest rate of increase in prices is applicable, and that the remaining 19 per cent. was constructed at a period to which, in accordance with the rate of depreciation of approximately 3 per cent. allowed by the commission, an average rate of depreciation of 12 per cent. would be applicable. Applying such rates, and accepting the remaining figures of the commission, the value of the property as a basis for return would be $661,710, upon which an earning of $39,395, found by the commission, would yield a return of 5.9 per cent., and, of course, the corrected earning of $34,583 would yield but little more than 5 per cent.

I cannot indulge the contention of complainant with respect to the percentage of depreciation. The commission applied 46 per cent., which is conceded to be in accordance with the straight line method. The accountant for the Gas Company applied the same rate at the hearing before the commission. Since that time a great many exposures of portions of the underground system have been made, and complainant contends that such examinations demonstrate that the deduction for depreciation should be reduced to 23 per cent. As our Circuit Court of Appeals has said, no general rule can be given for applying depreciation charges. However, the straight line method is the one most generally employed, and was accepted by both parties at the hearing before the commission. It seems as accurate and dependable as any method short of a physical examination of a very substantial part of the underground construction, by witnesses whose experience and observation qualify them to give opinions on such matters. Such an examination is, of course, impracticable, and was not made in the instant case. Mr. Moore, expert for complainant, testified that he had seen from 3 to 4 per cent. of all the pipes. Mr. Smith, the general superintendent, testified that nearly 15 per cent. of the mains have been uncovered and examined; this, from the testimony, is to my mind largely excessive. The other witnesses have examined comparatively small amounts. Furthermore, the testimony of a number of these examiners is of negligible value, and the percentages fixed are more or less arbitrary and unreliable. The court feels that the testimony of complainant in this respect is certainly no more reliable, and is less scientific, than the straight line method applied.

The going value of 5.7 per cent. is as low as can be found in the cases, and much lower than the average; but the court is not prepared, from the evidence, to say that it is inadequate.

The testimony of Superintendent Smith would indicate that the allowance of $21,000 for working capital is, and has been, amply sufficient; consequently, this item should not be disturbed.

[7] The question of leakage is a perplexing one, and one insusceptible of exact mathematical solution. The percentage found by the commission, to wit, 35.28 per cent., was, of course, excessive. No plant in this respect can be governed rigidly by the experience of other plants, where conditions are not identical. Complainant, by a diligent and expensive campaign, as it' says, has reduced the leakage to about 20 or 21 per cent. It insists that it cannot reduce it further and should not be held rigidly to 15 per cent. Of course, consumers should not be penalized by excessive and improvident waste in this regard. Some limit should be imposed, and I do not feel that upon this record I can arbitrarily depart from the finding of the commission and substitute a percentage which, of necessity, must be more or less arbitrary and uncertain; at the same time, I believe the commission has held the complainant company down to the very limit of possibility. It should be added that in a number of instances the commission has allowed the gas companies a reasonable sum as an operating expense for the cost of reducing leakage to the limit it has imposed. It did not do so in the present case.

One important item in the cost of reproduction was that for repaving over mains. It is shown that the cost of cutting and repaving over the mains as the streets are now paved would be $206,568, which, when depreciated at 46 per cent., amounts to $118,841. The commission's engineers show the estimated cost of paving, actually cut at the times the mains were laid, to be $80,289, which, when depreciated, amounts to $46,166, and this is the amount allowed by the commission. This item presents an embarrassing question. If we are to view the matter of reconstruction new from the standpoint of what it would cost at present to replace the plant, and then subject its item of paving to the same continuing percentage of depreciation to which all other items are subjected, it would seem that complainant's figures should prevail. On the other hand, this item forms no element of the physical property now in the hands of complainant. As an element of cost only the amount originally expended would seem to be pertinent, and, inasmuch as this item forms no part of the property owned and operated by the complainant, it is difficult to see on what principle the original actual cost should be subjected to depreciation. As said by the Circuit Court of Appeals in City of Minneapolis v. Rand et al., supra:

"Neither the original cost nor the present cost of reproduction is always a fair measure of the present value of the physical property of a gas company for rate-making purposes."

In this case, as generally, a combination of both measures was employed. This item of repaving might properly fall within either formula, and its gross or depreciation amount be determined accordingly. Certainly, under all the circumstances, the commission reduced this item to its lowest degree.

From the foregoing it would appear that the commission adopted standards and computations which cut the valuation of the property for rate-making purposes to the very bone. It employed a low percentage, under the testimony, to cover increase in prices, because it found that percentage used in City of Minneapolis v. Rand. It used as large a

percentage of depreciation as the circumstances would justify. It allowed about the lowest known percentage for going value. It reduced allowances for reproduction to the lowest conceivable figure. It held the percentage of allowable leakage down to a limit of doubtful practicability, and made no allowance for expenses necessary to realize that limit. It made no allowance for the expenses incidental to this rate hearing, contrary to a practice recognized by it in other proceedings. The result is a percentage of return meager in any aspect, and not calculated to assure confidence in the financial soundness of the utility, to support its credit, and to equip it to raise the money necessary for the proper discharge of its public duties.

But, suppose we accept the findings and figures of the commission, and test them by the actual experience of complainant over some years and months of operation. A return of 6.56 per cent. upon a valuation of $600,000 must allow an amount of $39,395.84 available for return, surplus, and contingencies. In 1921, at 33 cents paid for the gas, and 70 cents charged to consumers, the company realized only $38,903.63 as a net profit available for depreciation and return on investment. If to this we add $12,190.44, computed by the commission as necessary to bring the percentage of leakage down to 15 per cent,, and then subtract $23,322, the annual depreciation allowed by the commission, there would reman only $27,771.07. In 1922, during which period the company paid 33 cents for gas until April 1st, and after that time paid 40 cents, and distributed to consumers for 70 cents, the net profit available for depreciation and return was $41,751.69; deducting the amount allowed by the commission for depreciation would leave only a trifle over $18,000, and if but 2 per cent. be allowed for annual depreciation the net for return would be less than $30,000. If, during the same period, the company had been allowed to charge 77 cents for gas, the net profit available for depreciation and return on investment would have amounted to $55,626.89; deducting $23,322 for annual depreciation leaves a trifle more than $32,000. In 1923, with 40 cents paid for gas and 70 cents charged, the net profit available for both depreciation and return on investment was only $34,725.21. During that time the company was allowed to charge 77 cents for approximately two months under the temporary order of this court, but the excess was impounded and not covered into the company's treasury. During the same year, with 40 cents paid for gas and 77 cents charged, the net profit available for depreciation and return on investment, under the requirements of the commission of 15 per cent. loss of gas in distribution, would have amounted to $68,191.03; deducting $23,322 for annual depreciation leaves a trifle less than $45,000. This would amount to practically 7½ per cent. on the valuation fixed by the commission, a percentage which was approved in the case of City of Minneapolis v. Rand.

In no case, with the rate at 70 cents, has the company been able to earn a net return of 6 per cent., and on occasion the return has fallen below 5 per cent. With this actual experience before us, we are compelled to conclude that the rate fixed by this order of the commission would produce a reasonable return neither upon the corrected figures of the commission itself nor in practical operation. The Joplin Gas Com-

pany has no power to control its source of supply, nor the price charged by the Kansas Natural Gas Company. State of Missouri ex rel. Barrett, Attorney General, et al. v. Kansas National Gas Company (Kansas City Gas Company, Intervener) 282 Fed. 341. The rate of interest for loans on approved security in Joplin and its vicinity is at least 6 per cent. The return on investments in other business undertakings, which are attended by corresponding risks and uncertainties, is greater than that. Certainly capital and credit would not be attracted to an enterprise of this nature, the returns from which are known to be less certain and safe. In my opinion, the rate prescribed by the commission's order is unreasonable. and therefore confiscatory. The rate of 77 cents advanced to meet the increased cost will, it is shown, produce no unreasonable rate of return.

[8] The bill of complaint is sustained, and the temporary injunction made permanent. As said by the court in City of Minneapolis v. Rand:

"The making of rates to be charged consumers by a gas company or other public utility is a legislative and not a judicial function, and a court is without jurisdiction to change rates fixed by a legislative body."

Nevertheless it is within the power of the court to afford the temporary relief prayed. The order fixing the temporary rate which may be charged by the Gas Company at 77 cents will be continued in force, under the same terms heretofore prescribed, until such time as the defendants may determine what their future course may be. No doubt another application to the commission will produce the desired result. A decree may be prepared and entered in accordance with the views herein expressed.