No. 23,223.

THE CITY OF BAXTER SPRINGS, *Appellee and Appellant*, v. THE ES-
TATE OF G. FRANK BILGER, Deceased, et al., *Appellees* (W. B.
FOSHAY COMPANY et al., *Appellants and Appellees*).

### SYLLABUS BY THE COURT.

1. PUBLIC UTILITY—*Purchase of Waterworks System—Methods of Ascertain-
ing Value Thereof.* Methods adopted by engineers in ascertaining the
value of a public utility plant are matters of evidence, when presented to a
court, and not rules of law.

2. SAME—*Purchase of Waterworks System—Properties Appurtenant to the
System.* On the purchase of a waterworks system by a city from the own-
ers of the system, as between the city and the owners, the service lines
between the mains of the system and the property line of its consumers
belong to the owners of the system, whether put in by such owners or by
its consumers, where the franchise does not specify who shall pay the ex-
pense of putting in such service lines.

3. SAME—*Purchase of Waterworks System—Deductions from Engineer's Re-
port in Determining Value.* In an action to determine the value of a
waterworks system, deductions from the amount ascertained by engineers
to be the value may be made by the court where it, after a consideration
of all the evidence, finds that such deductions should be made.

4. SAME. In an action to ascertain the value of a waterworks system, the
court may deduct from the total valuation placed thereon by engineers
the value of any part of the plant as fixed by the engineers where the court
finds from the evidence that that part has no value whatever.

5. SAME—*Deductions for "Functional Depreciation."* In such an action, the
amount that shall be deducted for what is named "functional deprecia-
tion" is a matter that must be determined by the court from the evidence.

6. SAME—*Judgment—Costs—Compensation to Appraisers.* The judgment tax-
ing costs and awarding compensation to appraisers is not disturbed.

Appeal from Cherokee district court; FRANK W. Boss, judge. Opinion filed
February 11, 1922. Reversed.

*Fred A. Walker,* of Columbus, and *John M. Kinkel,* of Topeka, for appel-
lant Foshay Company.

*R. E. Rosenstein, Grant Waggoner,* both of Baxter Springs, and *Edward
E. Sapp,* of Galena, for appellee City of Baxter Springs.

The opinion of the court was delivered by

MARSHALL, J.: In this action the city asked the district court
to ascertain the value of the waterworks system of Baxter Springs,
built under a franchise granted by the city, which franchise pro-
vided that the city might purchase the waterworks system at any
time after five years. This action was commenced on December 1,
1919, on which day the city had elected to purchase the plant. Sec-
tion 7 of the franchise ordinance reads:

"Said city shall have the right to purchase, at any time after five years after

publication of this ordinance, all machinery, mains, pipes and all other properties that are part of and used in the operation of waterworks system and business of grantee or assigns, at their actual value, exclusive of any value to the franchise granted by this ordinance; such purchase by said city to be governed by and be in conformity with the provisions of Section 12 of Chapter 82 of the Session Laws of the State of Kansas, for the year 1897."

The parties stipulated that each should appoint an appraiser; that the court should appoint a third one; that the three should constitute a commission to appraise and ascertain the value of the plant and system exclusive of the franchise; that the commission of appraisers might examine "personally and by experts and such other persons as necessary and familiar with the cost and construction and condition of such plants and resort to other means within their power in order that they may arrive at the value thereof"; that upon the filing of the appraisement in the district court, either party should have the right to present further testimony; that the court should modify or modify and confirm the report; and that either party could appeal to the supreme court from the finding and order of the district court. Appraisers were appointed; they made a report; the matter was heard in the district court; additional evidence was there introduced; the value of the property was ascertained; and judgment was rendered accordingly. The owners of the plant and the city appeal.

The city urges three propositions: first, that the "court erred in including value of service lines and partial value of privately constructed lines"; second, that the court erred "in the method used at arriving at the value of the water plant and system"; third, that the court erred "in refusing to allow a sufficient sum for functional depreciation."

The owners of the plant urge three propositions: first, that the court erred in deducting $2,000 from the value of the plant on account of the private ownership of service lines; second, that the court erred in deducting from the report of the appraisers $4,977.21 on account of the method adopted by the appraisers in determining the value of the plant; third, that the court erred in deducting from the value of the plant $3,200 on account of a lease on wells and buildings.

1. A consideration of practices that are followed in the valuation of public utility properties will be of substantial benefit in reaching a conclusion on the matters presented by these appeals. Values of such properties are ascertained principally for one of three pur-

poses—taxation, rate making, or purchase. Different principles are followed in ascertaining the value of property for each of these purposes, although there is much discussion that the true value for one is the correct value for each of the other two. Valuations are made by taxation officers or bodies, by public utilities commissions or rate-making bodies, and by courts. Officers and bodies intrusted with the valuation of property for the purpose of levying taxes thereon, acting honestly in the performance of their duties, undertake to place as high a valuation on the property as it will reasonably bear when compared with other property. Rate-regulating bodies, acting just as honestly and undertaking to protect the public which they in a sense represent, make the valuation as low as it can be reasonably done. A court, when compelled to place a valuation on a public utility property, must ascertain the actual value without exaggeration on the one hand or undervaluation on the other. This inevitably leads to the different bodies placing different valuations on the property.

Most commodities have a known or easily ascertained value—the price at which the commodity sells in the market where men go to buy and sell. Public utility properties are not within this class of commodities; there is no market for them. They have a value, but that value cannot be accurately named as so many dollars in answer to a single, simple question. Other means must be resorted to for the purpose of ascertaining the values of these properties. The means most frequently and almost exclusively used has been that of employing engineers, skilled in the work of constructing such plants, of operating them, or of ascertaining their value, and of having those engineers make the valuations of the plants. Different methods are employed by engineers for this purpose. Two engineers, operating separately but under the same method in ascertaining the value of a single plant, will come to different conclusions because, in many of the steps taken, it is the judgment of the engineer that must be exercised and that judgment controls his conclusion, while the judgment of the other engineer on the same subject may be different and a different conclusion be reached. In nearly every controversy over the valuation of a public utility plant, the engineers for the opposite sides come to different conclusions concerning the value, that difference many times running into millions of dollars. Of the different methods used by engineers in doing this kind of work, one is known as the

original cost of construction, another as the cost of reproduction at the time of the valuation, and another as the cost of reproduction based on the average prices of material and labor covering a selected number of years ending with the time named for the date of the valuation. Others may exist or be yet devised. Each of these probably has its advantages over the others. A tax commission or a public utilities commission may adopt one method to the exclusion of the other two, but a court is not justified in doing the same thing.

Engineers testify as expert witnesses concerning their work, the manner in which they did it, and the conclusions reached by them. Their testimony must be considered just the same as the testimony of other expert witnesses. The court may be convinced that the method of one engineer is the best and may follow it, but the court is not justified in so doing until it has carefully considered the evidence presented by those using the other methods. These methods are not rules of law, but are matters of evidence and should be considered by the court as such. Certain factors are common to all these methods, such as the value of a going concern, the franchise value (excluded by the ordinance and stipulation in the present action), good-will value, depreciation, overhead expense, engineering cost, interest on idle money, etc. Of course, engineers in ascertaining the value of a plant should take into consideration every possible factor that enters into that value and should lay those factors before the court; and the court, when weighing the testimony of such engineers, should consider the conclusions reached, the methods adopted, and every factor that entered into the valuation and give to each factor such weight as the court thinks that each deserves, exactly the same as the court daily instructs the jury to consider evidence. There is no difference between the consideration of the evidence introduced for the purpose of ascertaining the value of a public utility plant and that introduced before a jury for the purpose of reaching the result in any action in which expert evidence may be introduced. While the testimony of expert witnesses in such matters may be entitled to greater weight than that of nonexpert witnesses, yet there is no rule of law which confines the court to the consideration of that kind of testimony. Nonexpert witnesses may testify to facts within their knowledge if those facts have any bearing upon the value of the property.

The court should consider all facts which would be considered

by a seller or a purchaser in negotiations for the sale of the property if there is evidence to establish those facts. Among such facts are original cost of construction, reproduction cost at the time fixed for the valuation, reproduction cost based on the average price of labor and material for a stated number of years up to and including the time fixed for the valuation, depreciation, the length of time the plant has been in operation, character of construction, in this case the size of the pipes and the depth at which they are laid, the cost of necessary repairs, additions and improvements, the adequacy of the plant to fulfill the purpose for which it was constructed, the ability of the plant to expand and meet increased demands, the possibility of increased demands, soil conditions, source of water supply, going-concern value, rates, revenues, expenses, the service rendered, the satisfaction or dissatisfaction of customers with the service, the density of the population served by the plant, and any other matter that would be a factor in determining its value. Anything that enhances or lowers the value of the property may be shown by evidence and should be considered by the court. Some of the things can best be detailed by experts; others can be testified to by nonexperts. When the court has considered all the evidence that has been offered and has reached a conclusion, that conclusion is just as binding on the supreme court as any result reached by a trial court on evidence that may have been conflicting or from which different minds might have reached different conclusions.

After such examination as this court has had time to make, no case has been found in which an appellate court has reversed the judgment of a trial court fixing the value of a public utility plant for error in ascertaining that value where all the evidence offered was received and considered and effect was given to all the factors that entered into such value.

2. On account of service lines which had been put in by the consumers of water to connect the property of the consumer with the water mains in the street, the court deducted $2,000 from the amount fixed in the report of the appraisers as the value of the plant. This the owners of the plant contend was error, while the city contends that a greater amount should have been deducted. The ordinance is silent concerning the duty of the water company to furnish water at the property line of the consumer. Under such circumstances, it seems to be well settled that it is the duty of

the water company to furnish the water at the property line. (*Pine Bluff Corporation v. Toney,* 96 Ark. 345; *Pocatello Water Co. v. Standley,* 7 Idaho, 155; *State ex rel. Otero de Burg, v. Water Co.,* 19 N. M. 36; *Bartlesville Water Co. v. City of Bartlesville,* 48 Okla. 344; *International Water Co. v. City of El Paso,* 51 Tex. Civ. App. 321; *Cleveland v. Malden Waterworks Co.,* 69 Wash. 541.) The city cites *Appleton Waterworks Co. v. Railroad Commission,* 154 Wis. 121, 139, but there the court said:

"We think it is true that the part of the service pipe above mentioned is part of the plant, whether paid for by the company or by the consumer."

The city also cites *Wichita Water Co. v. City of Wichita,* 271 Fed. 973, and quotes from the report of the special master in that case. However, the opinion in that case does not discuss the proposition now under consideration and does not materially assist this court.

If the consumers put in the service lines, they may have claims against the company for the expense of doing the work, unless they have been paid in some manner before this time. As between the city and the company, the service lines belonged to the company and were a part of the property that the city elected to purchase. Deductions from the value of the plant on account of service lines owned by consumers should not have been made. This compels a reversal of the judgment and is possibly all that need be said, but the other matters argued will be discussed.

3. Did the court in determining the value of the plant commit error in deducting $4,977.21 from the value named in the report of the appraisers, and did the court commit error in the method used to ascertain the value of the waterworks plant? In the abstract is found what appears to be the court's opinion in which the reasons were given for the conclusions reached. To get a clear understanding of the propositions now being discussed, it is necessary to quote extensively from that opinion. The court said:

"Now, on the matter that has given me perhaps more trouble than anything else, and that is the method of determining the value. Once or twice during the trial, perhaps more, I indicated that I thought that evidence of anything except the prices of labor and material as they existed on March 1, 1920, should not be received, although I admitted all the evidence. I think that was offered on the matter, subject to being considered or not considered as I might afterwards determine. I reviewed the authorities pretty closely, and I am of the opinion now I was in error, at least partly, on that proposition. *I do not find any authorities that take the view of Mr. Hodgson, dis-*

*senting engineer, or Mr. Veach, I believe his name was, the other engineer, in*
*the adoption of the method they suggest for arriving at this value. I don't*
*find any authority, I say, for doing that.* [Italics ours.] Most of the cases
admit evidence of an average price ranging for a period of five or ten years
immediately prior to the date of acquisition, in this case, on March 1, 1920.
I haven't found any cases now that admit evidence as has been offered in
this case taking a range of prices for a definite time prior—for some time
prior to the time of acquisition. But I recognize the fact that an unusual
condition exists at that time and I am now of the opinion the evidence
offered should be received and while neither that evidence nor the evidence
of prices for 1920 would be conclusive, yet I think both should be considered
and should be given such weight as the trier of the fact, whether the court
or appraisers, should determine it should be entitled to receive. It seems from
the report and also from the evidence of the appraisers that they did not
consider pre-war prices. As I say, I think pre-war prices should be considered.
I think the argument used in the cases is sound. It is not the price of the
plant, nor the cost of the plant, that is to be determined. The cost of repro-
duction is only one of the elements to be considered in fixing the ultimate
value. The weight to be given to that evidence is a matter of some con-
cern. I suppose it will just have to be estimated as any other evidence of
value or most other evidences of value must be estimated and I presume for
that purpose the court would probably be justified in taking judicial notice
of present day conditions, and the first thing to be determined is not what
the pre-war prices were or what the cost of reproduction would have been,
using pre-war prices, but those are admitted for determining or getting an
idea of what the future price might be. If a man is going to invest his money
in a plant he naturally considers whether the plant in a year from now or
two years from now is going to be worth more or less. If it is at the pinnacle
of high prices of labor and material he knows if he buys a plant now it is
going to deteriorate in value and he is going to have something on his
hands that he would have to stand a substantial loss on; on the other hand
we may be having abnormally high prices at this time—probably are—yet
when we look about us and see, within the past week or two, one single class
of wage earners having their wages increased six hundred million dollars,
and as a result thereof, freight rates increased 35 per cent, which necessarily
will enter into the price for some time to come of practically all commodities
there is a question in our mind just how much ought to be deducted on ac-
count of conditions as they exist at this time as compared with pre-war
conditions and pre-war prices. Yet, it is purely an estimate. I don't think
it could be arrived at by any percentage, and I have considered this evi-
dence, I think carefully, and I have made an arbitrary deduction of $4,977.21,
which leaves, after making the other deductions, the value of the plant as
I fix it, of $27,500.00."

Attention is called to the part italicized. This indicates that
the court in some degree regarded the methods adopted by the
engineers as something in the nature of rules of law and that the
court possibly disregarded the testimony of two of the engineers

who testified on the trial. If either was done, the court was in error. Their testimony should have been considered although it may not have been convincing.

4. Was it error for the court to deduct $3,200 on account of the lease on the well from which water had been procured by the owners of the waterworks plant? Again it will be profitable to quote from what the court said, as follows:

"Now on the question of the lease of the well and the part of the building: I am of the opinion as to that, that if the method adopted by the appraisers as to fixing the value is the correct method, then I am of the opinion that the amount they arrived at is correct, namely, $3,200.00. But I do not believe that the method is proper. The lease itself doesn't authorize the lessor to make the repairs of pulling the old casing and putting in the new. Without these repairs I think, from the evidence, that well would be worthless and, consequently, the lease would be worthless. Of course the building is leased only for the purpose of using the well, and, I say, the lessor evidently would not make the repairs; he is receiving, according to the evidence, $1.00 a year. The lease doesn't require him to make those repairs, which would cost, according to the evidence, $2,600.00. The lease neither requires nor authorizes the lessee to make those repairs; the evidence shows the building would have to be torn down. There is nothing showing the lessor would consent to that. There is probably some chances in tearing up the old casing and putting in new; there is no showing that would be consented to by the lessor and without that the repairs could not be made. There is another feature; the repairs would cost $2,600.00, the value of this lease, as fixed by the appraisers, would be $1,600.00 for the five years. It would be assuming a good bit to say the lessee would make $2,600.00 in repairs on a piece of property that was valued to him at $1,600.00; it might be done, but it is doubtful. On account of those questions I am of the opinion the $3,200.00 would have to be deducted, but, as I said in the beginning, if the method used by the appraisers in determining the value is correct, then I find the amount is correct."

Applying the principles declared in the first part of this opinion, it must be said that if satisfied that the well was valueless, the court was justified in not allowing anything for the well. If it had any value, that value should have been included as a part of the value of the entire plant. If it would cost as much to repair the existing well and put it in condition for use as it would to drill a new one and fit it for use, the value of the existing one would be very small, if anything. This, however, is a question for the trial court to determine from the evidence and is not a matter that can be finally disposed of by this court.

5. Did the court commit error "in refusing to allow a sufficient sum for functional depreciation"? The court allowed $5,751.79 under this head, which was the amount named by the appraisers.

Mourning v. Railways Co.

This again was a matter to be determined by the court from the evidence, and when the trial court has weighed and considered the evidence, and from it has found the amount that should be allowed under this head, that finding will be final and conclusive in this court.

6. Complaint is made of the taxation of costs and of the allowance of fees to engineers who acted as appraisers. The district court had a much better opportunity to determine the proper division of the costs and compensation to be paid than this court has. The judgment of the district court in this respect will not be disturbed.

All the matters presented have been discussed because they have been argued and because it is thought advisable to do so for the purpose of rendering such assistance in correctly reaching a final conclusion in this matter as this court may be able to give.

The judgment is reversed, and a new trial is directed, but it is not necessary again to hear all the evidence. The evidence that has been introduced exists in the form of a transcript and may be reëxamined and reconsidered. The court is directed to ascertain again the value of the plant. If either of the parties desire to introduce additional evidence upon any fact not covered by the evidence that has been introduced, it may be well to reopen the case and hear such additional evidence. This, however, is a matter that must address itself to the sound discretion of the district court.