THE STATE OF WASHINGTON, *on the Relation of Oregon-Washington Water Service Company et al., Plaintiffs,* v. THE CITY OF HOQUIAM *et al., Respondents.*

THE CITY OF HOQUIAM, *Respondent,* v. OREGON-WASHINGTON WATER SERVICE COMPANY *et al., Appellants.*[1]

[1]Reported in 286 Pac. 286; 287 Pac. 670.

*Donworth, Todd & Holman, McCutchen, Olney, Mannon & Greene,* and *Frank C. Owings,* for relators.

*W. H. Abel, A. E. Cross,* and *John D. Ehrhart,* for respondents.

MAIN, J.—This action was brought to condemn the water system of the city of Hoquiam which at the time was owned by the Oregon-Washington Water Service Company. The trial resulted in a judgment of condemnation fixing the value of the property and, sub-

sequently, a decree of appropriation. The case is here for review of both of these judgments.

The facts may be summarized as follows: About the year 1898, the city of Hoquiam granted a franchise to the Hoquiam Water Company to construct and operate a water system to supply the city with water for domestic and other purposes. This franchise provided that, at the end of fifteen years, or any five-year period thereafter, the city might, by giving one year's notice, elect to take over the plant. April 6, 1927, the city passed a resolution declaring its intention to acquire the water works system, then owned by the Hoquiam Water Company. Subsequent to the passage of this resolution, the Oregon-Washington Water Service Company acquired the property. Thereafter, in pursuance of an ordinance of the city, an action was brought in condemnation to determine the value of the property. The trial of this action began on or about June 10, 1929, before the court and a jury, and was concluded August 1, 1929. During the trial of the action, a stipulation was entered into by the parties as follows:

"It is hereby stipulated by and between the parties to the above entitled action, by their respective attorneys, duly authorized, signing this stipulation, that owing to the sickness of one of the jurors in said cause, the jury duly impaneled to try the issues herein be discharged and relieved from further service in said cause, and that the trial of said cause shall proceed before the Honorable J. M. Phillips, trial judge in said action, upon the evidence and testimony already introduced, and hereafter introduced, and that the jurisdiction of said judge and court to determine the issues in said cause is hereby agreed and consented to by the respective parties.

"It is further stipulated and agreed that said trial judge shall determine and make a general finding as to the present fair market value of the property and

property rights of the Oregon-Washington Water Service Company, involved in this action, and of the property and property rights of each and every of the other defendants in said cause which general finding shall have the same force and effect as a verdict of the jury in said cause, and that the judgment and decree based thereon shall have the same force and effect as a judgment and decree rendered upon a verdict of a jury in said action, and the parties severally waive the right to require any other findings of fact or conclusions of law.

"Done in open court this 22nd day of July, 1929."

This stipulation was signed by counsel for all of the parties and was later in open court approved by them. It will be noticed that by this stipulation it was agreed that the jury should be discharged and that the court should fix the value of the property. After the taking of evidence was concluded, the trial court spent a number of days going over the property with a representative of each of the parties, and later entered this finding:

"It is the judgment of the court that the present, fair market value of the property, and property rights of the defendants, involved in this action, is the sum of $510,000.

"Dated this 27th day of August, 1929.

"J. M. PHILLIPS, Judge."

Generally speaking, the water supply system of the city, at the time of the condemnation, consisted of three units, the first of which obtained its supply from the Little Hoquiam river, which rises some miles west of the city and flows in an easterly direction. The second source of supply was located on the north fork of the Little Hoquiam. The third source was Davis creek, which is eight or nine miles to the north of the city. A dam was constructed in Davis creek and a transmission main by gravity carried the water from there to

the distributing system of the city. At the time of the trial and for some time prior thereto, the source of supply from the Little Hoquiam river and the north fork thereof was little used. Upon the trial the city's witnesses took the position that the Little Hoquiam plant and the North Fork plant were of only salvage value. The company's witnesses testified that they were valuable as standby plants, and placed upon them a value based upon reconstruction cost less depreciation.

There was a substantial conflict in the evidence offered by the respective parties upon all of the material questions. It will be admitted that the company was entitled to the fair market value of its property, and that, if any well recognized elements of value were not included in the judgment, then it cannot be sustained. In considering the questions presented, we will substantially follow their order as they appear in the company's opening brief.

█ It is first contended that the placing of a salvage value upon the plants of the system first constructed, which are referred to as non-operating property, was not in accordance with the ordinance of the city which provided for the acquisition of the system, because what is referred to as reservoir No. 2, and which was treated by the city's witnesses as non-operating property, was referred to in this ordinance. We find nothing in the ordinance which required the city, in the event that it took over the property, to treat the reservoir either as operating or non-operating property for the purpose of determining its value. This reservoir, as one witness testified, was not used and had the appearance of not having been used.

The cases of *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998, and *George v. Anacortes,* 147 Wash. 242, 265 Pac. 477, relied upon by the company as

sustaining its contention in reference to this reservoir, as we read them do not do so. In the *Uhler* case, the question was whether, after the ordinance had been passed fixing the amount of the bonds which should be issued for a water system, the city had a right to repeal this ordinance and increase the amount in a substantial sum. In the *George* case, the question was whether the city, after providing for the construction of a system and its approval by the electors, could abandon a substantial part of it. The distinction between those cases and the one now before us is substantial.

It is next contended that, in arriving at reproduction cost, no allowance was made by the city's witnesses for cutting and replacing pavement. At the time the water distributing mains of the city were placed in the ground, no paving was required to be cut and replaced. The cutting and replacing of pavement, under these circumstances, was not an element of value to which the company was entitled. In *Des Moines Gas Co. v. Des Moines*, 238 U. S. 153, it is said:

"As to the item of $140,000, which, it is contended, should be added to the valuation, because of the fact that the Master valued the property on the basis of the cost of reproduction new, less depreciation, and it would be necessary in such reproduction to take up and replace pavements on streets which were unpaved when the gas mains were laid, in order to replace the mains, we are of opinion that the court below correctly disposed of this question. These pavements were already in place. It may be conceded that they would require removal at the time when it became necessary to reproduce the plant in this respect. The Master reached the conclusion that the life of the mains would not be enhanced by the necessity of removing the pavements, and that the company had no right of property in the pavements thus dealt with, and that there was neither justice nor equity in requiring the people who had been at the expense of paving the streets to pay an additional sum for gas because the plant, when put in,

would have to be at the expense of taking up and re-placing the pavements in building the same. He held that such added value was wholly theoretical, when no benefit was derived therefrom. We find no error in this disposition of the question.''

The case of *Pacific Gas & Electric Co. v. City and County of San Francisco,* 273 Fed. 937, is to the same effect.

■ It is next contended that the city's witnesses improperly used what is called the straight-line method for the purpose of determining the depreciation. All of the city's engineers who testified had spent a sub-stantial amount of time going over the plant for the purpose of determining its value. When called as wit-nesses, they took into consideration the observation that they had made and, together with that, applied the straight-line method of depreciation. That method has frequently been approved by the courts as a proper one. The company's witnesses, with one exception, for the purpose of determining the depreciation, applied what is called the observation method. One of them used the sinking-fund method. These various methods are not rules of law, but are matters of evidence and should be considered as such. In *City of Baxter Springs v. Bilger's Estate,* 110 Kan. 409, 204 Pac. 678, it is said:

''Engineers testify as expert witnesses concerning their work, the manner in which they did it, and the conclusions reached by them. Their testimony must be considered just the same as the testimony of other expert witnesses. The court may be convinced that the method of one engineer is the best and may follow it, but the court is not justified in so doing until it has carefully considered the evidence presented by those using the other methods. These methods are not rules of law, but are matters of evidence and should be con-sidered by the court as such.''

In *Pacific Gas & Electric Co. v. Devlin,* 188 Cal. 33, 203 Pac. 1058, the straight-line method of depreciation is approved. It was there said:

"If the actual physical condition could be determined by actual test and inspection, that, of course, would give the most satisfactory results; but, in the absence of such direct appraisement, the natural method would seem to be to ascertain from the life tables of such utilities and from such examination as can be made the prospective life of the commodity, and apportion the depreciation according to its age. The following California public utility cases are cited as upholding the straight-line method: *Southern California Edison Co.* Case, 11 C. R. C. D. 83; *Marin Water & Power Company v. Railroad Comm.,* 6 C. R. C. D. 507, 520; *Northern California Power Co.* Case, 17 C. R. C. D. 98. Respondents also quote from the case of *National Telephone Company, Ltd., v. Postmaster General,* 16 A. T. & T. Co. Com. L. 491, Jan. 13, 1913; 2 Whitten's Valuation of Public Service Corporations, page 1112, as follows:

" 'Two methods of depreciation have been put before us, and two different ways of regarding the life of the plant. The two methods have been described as the sinking fund method, which has been put forward by the company, and the straight-line method, which has been put forward by the Postmaster General.

" 'The sinking fund method is based upon the effect of compound interest. . . . This seems to me to be purely a revenue question, and to have nothing to do directly with the value of the plant as between a vendor and a vendee. It was admitted by the very eminent witnesses called for the company upon this point that this method had never in their experience been applied as between a buyer and a seller. I admit this method will give you a perfectly correct arithmetical result, but it does not take into consideration those matters which properly affect the mind of a buyer. . . . I come to the conclusion, therefore, that the Postmaster General's method of depreciation, which is the ordinary straight-line method, is that which should be

applied. In this method the value is reduced in the ratio which the age bears to the life of the plant.' "

In *Joplin Gas Co. v. Public Service Commission of Missouri,* 296 Fed. 271, it is said:

"As our circuit court of appeals has said, no general rule can be given for applying depreciation charges. However, the straight-line method is the one most generally employed, and was accepted by both parties at the hearing before the commission. It seems as accurate and dependable as any method short of a physical examination of a very substantial part of the underground construction, by witnesses whose experience and observation qualify them to give opinions on such matters. Such an examination is of course, impracticable, and was not made in the instant case."

The case of the *City of Minneapolis v. Rand,* 285 Fed. 818, is to the same effect.

It is at once apparent that the condition of the thirty-five miles or more of pipe in this case which was underground could not be subjected in detail to the observation method.

The cases of *McCardle v. Indianapolis Water Co.,* 272 U. S. 400; *Pacific Gas & Electric Co. v. City and County of San Francisco,* 265 U. S. 403; and *Pacific Telephone & Telegraph Co. v. Whitcomb,* 12 Fed. (2d) 279, are not out of harmony with what has been herein said. Those cases go no further than to hold that the observation method, when it is practicable to apply it, is to be preferred. They do not hold the straight-line method or the sinking fund method illegal methods of determining depreciation. There was no error in the reception of evidence of depreciation based upon the straight-line method.

It is next contended that the witnesses for the city gave no proper consideration to what is known as going-concern value, or going value, as one of the witnesses for the company said was the correct expression.

688

Most of the witnesses for the city did not, in determining value, take into consideration going value. One of them did and placed a specific sum upon it. The witnesses for the company took going value into consideration at a substantial amount. The value of the property as fixed by the court at $510,000 was approximately $110,000 higher than the highest value placed thereon by any of the city's witnesses. It cannot be determined from this record that the court did not, in fixing the value of the plant, take into consideration going value.

It is next contended that the city's witnesses were not qualified to testify as to market value. This testimony was received over the specific objection of the company. The witnesses of the city, five in number, were engineers of many years experience who had designed, constructed and appraised plants similar to the one in controversy. As above stated, they had spent a substantial amount of time in going over the plant in order to qualify themselves to testify as to its value. Whether an expert witness is qualified to give an opinion, is a matter which is peculiarly within the discretion of the trial court, and, unless that discretion has been abused, this court will not disturb the ruling in admitting such testimony. *Traver v. Spokane Street R. Co.*, 25 Wash. 225, 65 Pac. 284, and *Czarecki v. Seattle & S. F. R & Nav. Co.*, 30 Wash. 288, 70 Pac. 750.

Witnesses who are not strictly experts but who have some knowledge of value may testify. The fact that the knowledge is slight goes to the weight of their testimony rather than to its competency. *Johnson v. Tacoma*, 41 Wash. 51, 82 Pac. 1092; Elliott on Evidence, Vol. I, § 685; Wigmore on Evidence, Vol. I (2d ed.), § 561; *Ham, Yearsley & Ryrie v. Northern Pacific R. Co.*, 110 Wash. 467, 188 Pac. 527; *Wilkins v. Knox*, 142 Wash. 571, 253 Pac. 797. The ruling of the trial court in receiving the testimony of the city's witnesses as

to value was right and cannot be disturbed. Considering the particular subject matter, their knowledge and experience was such that their opinions as to value was something which the trial court rightly admitted in evidence and considered.

There are two or three other minor contentions upon this branch of the case which have been considered but do not appear to us to be of sufficient moment to require a detailed discussion. In our opinion they do not possess substantial merit.

■ Up to this point, we have considered the finding of the trial court as though it had the same force and effect as a verdict of the jury. The stipulation above quoted recites that the court shall make a general finding which shall have the ''same force and effect as a verdict of the jury in said cause.'' We have taken the language used in the stipulation at its face value. The right of the parties to make such a stipulation can hardly be questioned. In determining its value, the trial court, giving the finding the same force and effect as a verdict of the jury, had a right to adopt the lowest value placed upon the property by any of the city's witnesses. *In re East Spring Street,* 41 Wash. 366, 83 Pac. 242. This was not done, but a value of $110,000 higher than the highest value placed upon the property by any of the city's witnesses was fixed. In view of this situation it cannot be held that the trial court disregarded well recognized elements of value.

■ Assuming, however, that the finding of the trial court as to the value does not have the same force and effect as a verdict of a jury, but only the force and effect of a finding of fact made by the trial court in a cause tried without a jury, the result would not be different. We have read the evidence in this case with painstaking care, and we are not able to say

that the finding of the trial court is not sustained thereby. As already stated, upon all material questions, the evidence was in conflict. The trial court, as already indicated, spent a number of days in going over the plant with a representative of each of the parties, and was in a much better position to give the proper weight to the testimony of the various witnesses than are we. It would serve no useful purpose, and it would unnecessarily prolong this opinion, to attempt to review the evidence in detail. Whether the finding be considered to have the same force and effect as a verdict of a jury or only the force and effect of an ordinary finding of the trial court upon a question of fact, it must be sustained because there does not inhere in it any error of law and, as we view it, it is sustained by the evidence.

 It is next contended that the judgment of condemnation and award of damages entered September 9, 1929, and the decree of possession and appropriation entered October 11, 1929, are each erroneous because no notice was given to the water company prior to the entry of either of the judgments. Rem. Comp. Stat., § 241, in part, provides that, "after appearance a defendant is entitled to notice of all subsequent proceedings." Section 242 provides that,

"When a party to an action has appeared in the same, he shall be entitled to at least three days' notice of any trial, hearing, motion, application, sale or proceeding therein; . . ."

As to the judgment of condemnation and award of damages, no notice was necessary. In *Brooks v. James,* 16 Wash. 335, 47 Pac. 751, it was held that, under the section of the statute last above referred to, the adverse party was not entitled to notice of the entry of the judgment. The holding of that case has been approved in the cases of *White Crest Canning Co. v.*

*Sims,* 30 Wash. 374, 70 Pac. 1003; *Kinkade v. Witherop,* 29 Wash. 10, 69 Pac. 399; *Fisher v. Puget Sound Brick, Tile & Terra Cotta Co.,* 34 Wash. 578, 76 Pac. 107, and *Allen v. Allen,* 96 Wash. 689, 165 Pac. 889. In the case last cited it was said:

"As a matter of law, the appellant was not entitled to notice of the time and place of signing the findings of fact and conclusions of law and judgment. Upon this question, in *Lindsay v. Scott,* 56 Wash. 206, 105 Pac. 462, it was said:

" 'The appellants were not entitled to notice of the time and place of signing the findings of fact, conclusions of law, or judgment, as a matter of law, nor were they deprived of the benefit of exceptions for want of notice. The right to except continues until the lapse of five days after notice of the filing of the findings, under the express terms of the statute, and repeated rulings of this court.' "

The reason that the party against whom the judgment runs is not entitled to notice of its entry is because on the trial he has had an opportunity for a full hearing, and the entering of the judgment presents no new question or issue. It is but a carrying into effect the result of the trial.

As to the decree of possession and appropriation, the situation is different. Section 9231, Rem. Comp. Stat., provides that the court, upon proof that the compensation found has been paid to the person entitled thereto or "has been paid into court as directed by the court," shall enter an order that the city shall have the right at any time thereafter to take possession of the property in respect to which the compensation has been so paid. The property owner is interested in determining whether the money has been paid as the statute specifies that it should. This is a question upon which he has had no opportunity to be heard prior to the time of the presentation of the de-

cree and therefore is entitled to the notice prescribed by the statute. Had the money in this case been actually paid into court and deposited in a bank of the water company's selection, it may be that the irregularity could be considered not prejudicial.

In this case, however, the city paid the judgment by check drawn to the clerk of the court, who deposited the same in the First National Bank of Hoquiam, which bank had purchased the bonds out of the proceeds of which the city was to pay for the water system. After this court acquired jurisdiction of the cause, the water company moved that the deposit be moved from the First National Bank of Hoquiam and deposited in a bank which it recommended. This motion was resisted and by one of the departments of the court was overruled.

The statute provides not that the award shall be paid to the clerk of the court by check, but shall be paid into court. The fair inference from the statute is that it contemplates payment in money and not by check. There appears to be no escape from the holding that the award was not paid into court in the manner prescribed by the statute and upon notice to the opposite party, and therefore the attempted payment by check to the clerk was ineffectual to satisfy the requirements of the statute.

It is next contended that the amended complaint to which a demurrer was interposed and overruled does not state facts which sustain the decree of October 11, 1929. The complaint was defective in that it did not contain a copy of the condemnation ordinance or the prior ordinance adopting the system or plan for the acquisition of the water system. These ordinances were referred to by title. Upon the trial the court ordered that the condemnation ordinance be attached to the complaint, but this appears not to have been

done. Both ordinances were introduced in evidence and are a part of the record in the case. The failure to attach the condemnation ordinance to the complaint was a mere irregularity, and the decree should not be set aside for this reason.

Further than this, it appears to be contended that the ordinance was not sufficient in itself to sustain the proceeding. Section 9488, Rem. Comp. Stat., authorizes any incorporated city or town within this state to construct, condemn and acquire public utilities. It was from this statute that the city of Hoquiam derived its power to take over by condemnation the water system. Referring to that statute in *Redmond v. Perrigo,* 84 Wash. 407, 146 Pac. 838, it was held that a condemnation would not fail because that statute did not prescribe the method thereof. It appears to us that the objection to the complaint and to the ordinance is not well founded.

It is next contended that the judgment and decree of appropriation are erroneous because they provide for taking over certain materials, tools and supplies, the value of which had not been determined. Near the end of the trial, the question arose as to how the current stores, supplies, tools and miscellaneous equipment, which were not included in the agreed inventory, should be determined, the stores and supplies being something, of course, that was changing from day to day. It was stipulated in open court that, as to the stores, supplies, tools and miscellaneous equipment, each of the parties should name an appraiser to fix the value thereof, and, if the two appraisers did not agree, then the matter should

". . . be submitted to the court informally and the court shall determine the amount to be paid for stores and supplies and for such miscellaneous tools and equipment as is not included in the agreed inventory."

This stipulation does not make it clear whether it was the understanding of the parties that the value should be fixed upon the stores, supplies, tools and miscellaneous equipment prior to the time that the property was turned over to the city or after. Inasmuch as the decree of possession and appropriation must be set aside for the reason above indicated, this question does not become very material. When the case goes back for the award to be properly paid into court upon notice, the court shall give the parties five days in which to make the appraisment in accordance with the stipulation referred to before the decree of possession and appropriation is reentered. If the appraisers do not agree and report within five days, then the court, in accordance with the stipulation, shall informally determine the value of the stores, supplies, tools and miscellaneous equipment covered by the stipulation, and, upon making such determination, shall enter a decree of possession and appropriation.

It is finally contended that the award and decree of appropriation deprives the water company of its property without due process of law in violation of the fourteenth amendment to the constitution of the United States. In this connection it is said that the award and decree are unconstitutional and void because they make no allowance for additions and betterments to the plant since the date of the trial. In this state the value of the property is fixed as of the time of the trial. The property owner is entitled to interest from the date of the award and to the income of the property up to the time that the amount of the award is paid to the property owner or into court in the manner provided by statute for his benefit. *North Coast R. Co. v. Aumiller,* 61 Wash. 271, 112 Pac. 384; *State ex rel. Washington Public Service Co. v. Superior Court,* 86 Wash. 155, 149 Pac. 652. Under a somewhat

similiar situation it was held in *Weiser Valley Land & Water Co. v. Ryan,* 190 Fed. 417, that the property owner was not entitled to betterments placed upon the property subsequent to the time that the compensation thereof was determined. In that case it was said:

"The next contention is that the court erred in adding interest to the amount of the assessment from the date of the summons. Under the statute, the right to the compensation shall be deemed to have accrued at the date of the summons. Having such right to compensation at a given time, it would seem that the owner ought to have interest upon the amount ascertained until paid. In the meanwhile he can claim nothing for added improvements, nor is he entitled to any advance that might affect the value of the property." (Citing authorities.)

The holding in that case was approved in *Brown v. United States,* 263 U. S. 78. The cases of *Cobb v. Boston,* 109 Mass. 438; *Morris v. Coleman County,* 28 S. W. (Tex. Civ. App.) 380; and *Holton v. Butler,* 22 Iowa 557, are to the same effect.

The case of *Passaic Consolidated Water Co. v. McCutcheon,* 144 Atl. (N. J.) 571, is not controlling. The statute of the state of New Jersey, which was involved in that case, provided that in making the award no consideration was to be given to extensions and betterments added to the property after the filing of the petition. The court pointed out that, in the ordinary case of condemnation of a public utility, considerable time would elapse between the filing of the petition and the trial to determine the amount of the award, and that additions and betterments in the ordinary course would be required, and for this reason the owner of the property would not be able to obtain just compensation. In this state, as above stated, the situation is different. The value of the property is fixed at the time of the trial. The property owner is entitled to

interest from the date of the award and the income from the property until the money is paid into court. As a rule no great amount of time would elapse between the determination of the amount of the award and the payment of the same into court, during which period the amount necessarily expended for additions and betterments, if there should be such, would be compensated for out of the interest and the income of the property. The fourteenth amendment to the constitution of the United States has not been impinged.

The judgment of condemnation and award of damages entered September 9, 1929, will be affirmed. The decree of possession and appropriation entered October 11, 1929, will be set aside and the cause remanded to the superior court for further proceedings as herein indicated.

All concur.

### On Rehearing.

[*En Banc.* May 6, 1930.]

Per Curiam.—In this case, since the opinion was filed, a petition has been presented by the water service company and the other parties on that side of the controversy similarly situated, in which we are asked to do two things: First, direct the superior court to strike from the judgment of condemnation and award a certain provision; and second, determine the manner in which the money shall be paid into court as related to the taxes which are to be deducted therefrom.

Taking these questions up in the order stated, it appears that there is an inconsistency between the judgment and the opinion in one particular. In the judgment it is recited:

"That this judgment shall draw interest from August 27, 1929, against which interest shall be credited the net revenues from the operation of said

water works system, up to and not exceeding the amount of said interest from said date August 27, 1929, up to the date of taking possession of said water works system by city of Hoquiam."

In the opinion, it is said:

"The property owner is entitled to interest from the date of the award and to the income of the property up to the time that the amount of the award is paid to the property owner or into court in the manner provided by statute for his benefit."

The trial court is directed to strike from the judgment that portion of the paragraph above quoted which is inconsistent with what is said in the quoted portion of the opinion.

Upon the second question, two things are to be determined: (a) The manner in which the money is to be paid in, as related to taxes; and (b) what taxes are to be deducted.

Section 9229, Rem. Comp. Stat., provides:

"Such city or town may offset against any award of the jury or court for the taking or damaging of any lot, block, tract or parcel of land or other property, any general taxes or local assessments unpaid at the time such award is made. Such offset shall be made by deducting the amount of such unpaid taxes and assessments at the time of payment of the judgment or issuance of a warrant in payment of such judgment."

Under this section, the city is not authorized to pay into court the entire amount of the award and make it subject to a lien for the taxes which may be deducted, thus putting the burden of determining the amount of the taxes on the opposite party. It is the duty of the city to determine the amount of the taxes which may be deducted, pay the same and furnish evidence thereof, or pay the amount of the taxes into court subject to a lien therefor and then pay the balance into court without any limitation or restriction.

The question of what taxes may be deducted when the money is paid into court upon a condemnation award was fully considered in the recent case of *Bethany Presbyterian Church v. Seattle,* 154 Wash. 529, 282 Pac. 922, and it was there said:

"When did title to the land pass from the church to the city as the result of the eminent domain proceeding? In Rem. Comp. Stat., § 9231, relating to eminent domain proceedings by cities, we read:

" 'The court, upon proof that just compensation so found by the jury, or by the court in case the jury is waived, together with costs, has been paid to the person entitled thereto, or has been paid into court as directed by the court, shall enter an order that the city or town shall have the right at any time thereafter to take possession of or damage the property in respect to which such compensation shall have been so paid or paid into court as aforesaid, and thereupon, the title to any property so taken shall be vested in fee simple in such city or town.'

"The record before us does not show when the formal order, as contemplated by that section, was entered by the superior court. We are warranted in assuming that it was entered simultaneously with the making of the payment of the award by the city to the church, that is, on January 16, 1929. In *Port of Seattle v. Yesler Estate,* 83 Wash. 166, 145 Pac. 209, we held that, under that section, then known as Rem. & Bal. Code, § 7784 (Rem. 1927 Sup., § 11097-104), title passed to the Port of Seattle at the time it paid the award, it there exercising its eminent domain right as the city exercised it in this eminent domain proceeding under the same statute. Our later decisions in *State ex rel. Struntz v. Spokane County,* 85 Wash. 187, 147 Pac. 879 and *State ex rel. Moore v. Superior Court,* 100 Wash. 481, are in harmony with that holding. We conclude that title to the land passed from the church to the city on January 16, 1929.

"When did the taxes for the year 1928 become a lien upon the land as between the church and the city, viewing them as grantor and grantee? In chapter 130,

Laws of 1925, Ex. Ses., p. 293 (Rem. 1927 Sup. § 11087-104), relating to assessment, levy, collection and lien of general taxes, we read:

" 'Sec. 104. The taxes assessed upon real property shall be a lien thereon from and including the first day of March in the year in which they are levied until the same are paid, but as between a grantor and grantee such lien shall not attach until the first Monday in February of the succeeding year.'

"This quotation is a reenacted provision of our previously existing statutes. Thus, it becomes plain that, viewing the church and the city as grantor and grantee, title to the land passed from the church to the city on January 16, 1929, without any obligation on the part of the church to the city to assume or pay the taxes levied upon the land for the year 1928.

"Does the law regard the church and the city as conventional grantor and grantee, as if a voluntary conveyance had been made by the church to the city instead of title to the land passing by virtue of the eminent domain proceeding and payment of the award as therein adjudicated? Our recent decision in *American Creameries Co. v. Armour & Co.,* 149 Wash. 690, 271 Pac. 896, and the authorities therein noticed, we think, are decisive in favor of the church upon this question; that is that the title passed from the church to the city, in legal effect, as from grantor to grantee. Our decision in *Port of Seattle v. Yesler Estate,* 83 Wash. 166, 145 Pac. 209, is in harmony with and lends support to this view. Here was a transfer of title from the church to the city as if by deed the church had warranted the title as against existing general tax liens such as would have entitled the city to satisfy such liens out of the purchase price, but not the tax of 1928, as a lien against the land, because, by the above express statutory provision, such tax, as between the grantor church and the grantee city, did not become a lien upon the land until the second Monday in February, 1929, four weeks after January 16, 1929, when the title to the land passed from the church to the city. In justice to the trial judge, we observe that our recent decision in *American Creameries Co. v. Armour & Co., supra,* was decided but a short time prior to the entry

of the order here appealed from, and manifestly was not called to the attention of the trial judge.

"Did the judgment in the eminent domain proceeding rendered July 5, 1928, award to the county, for the 1928 taxes, any portion of the $9,427.50 awarded for the taking of the land? There is nothing in the record before us so indicating. Indeed, so far as the record here advises us, it does not appear that the county was a party to the eminent domain proceeding in the superior court, or that it asserted any right to any portion of the award until it joined with the city in asking payment to it of the $343.63 in the hands of the clerk of the court. We cannot presume that the judgment award rendered July 5, 1928, adjudicated the right in the county to participate in the award to the extent of the amount of the general taxes against the land for the year 1928, to become payable more than six months thereafter, on the first Monday in February, 1929. Indeed, we think it would have been error, prejudicial to the rights of the church, to have so adjudicated in the judgment making the award, for, as we have seen, the church had the right to an award for the city's taking of the land, undiminished by the taxes of 1928, which, as between it as grantor and the city as grantee, would not become a lien upon the land until more than six months thereafter, on the second Monday of February, 1929.

"There is another matter which seems worthy of some note in our present inquiry, though but briefly mentioned in the arguments of counsel. In Rem. Comp. Stat., § 9229, we read:

" 'Such city or town may offset against any award of the jury or court for the taking or damaging of any lot, block, tract or parcel of land or other property, any general taxes or local assessments unpaid at the time such award is made. Such offset shall be made by deducting the amount of such unpaid taxes and assessments at the time of payment of the judgment or issuance of a warrant in payment of such judgment.'

"This was enacted by chapter 210, Laws of 1909, p. 723, as part of an amendment to our statute providing for the exercise of the right of eminent domain by cities. Reading this provision in connection with

the above quoted language of § 104, chapter 130, Laws of 1925, Ex. Ses., p. 293, we think it does not mean that a city acquiring land by an eminent domain proceeding shall have the right to offset and deduct from the eminent domain award the amount of general taxes against the land maturing and payable on the second Monday of February next following the city's acquiring title thereto by such eminent domain proceeding; since, as we have seen, such tax does not, as between the grantor and grantee, become a lien upon the land until such date. Such is the nature of the tax here in question, and therefore it did not become a lien upon the land as between the church as grantor and the city as grantee until after the passing of the title from the church to the city on January 16, 1929.

"We deem it proper to here make it plain that we do not express any opinion as to whether or not the county has the right of payment of the 1928 taxes against this land, either as a claim against the city or as an enforceable lien against the land in the hands of the city. We are only deciding that the church is entitled to the whole of the eminent domain award, because, at the time the city acquired title to the land by its eminent domain proceeding, the tax in question had not become a lien upon the land as between the church as grantor and the city as grantee."

In the case now before us, the city, in its answer to the petition, contends that the 1929 taxes, since they have become a lien upon the property, should be deducted, as well as the 1928 taxes. Under the doctrine of the case cited, this contention must be sustained. The city of Hoquiam has not yet paid the money into court, the title to the property has not passed, and, under § 104, ch. 130, Laws of 1925, Ex. Ses., p. 293 (Rem. 1927 Sup., § 11097-104), the 1929 taxes, as between a grantor and grantee, became a lien upon the property on the first Monday in February, 1930, and are therefore subject to be deducted from the award.

The petition, except as otherwise herein indicated, will be denied.