[No. 29200.   Department One.   January 19, 1944.]

THE STATE OF WASHINGTON, *on the Relation of John F. Chesterley et al., Plaintiff,* v. THE SUPERIOR COURT FOR YAKIMA COUNTY *et al., Respondents.*[1]

*George C. Twohy,* for relators.

*The Attorney General* and *Harold Pebbles, Assistant,* for respondents.

BEALS, J.—During the month of July, 1943, the state of Washington filed in the superior court for Yakima county

[1]Reported in 144 P. (2d) 916.

seven notices in condemnation, including one in which John F. Chesterley and others were respondents, seeking an adjudication of public use of, and to condemn and appropriate, certain real estate and other property in Yakima county, "for the construction, maintenance and operation of a drift fence and for the establishment of a game animal sanctuary." All seven proceedings came on regularly for hearing before the court August 24, 1943, and were consolidated for trial, in so far as the entry of an order adjudicating a public use was concerned. Evidence was heard and, after argument and consideration, the court, September 15, 1943, over the protest of the respective respondents, entered in each case an order entitled "Order Adjudicating Public Use," each order adjudicating that the contemplated use for which the land, real estate, premises, or other property was sought to be condemned was a public use of the state of Washington, and directing that determination be had of the compensation and damages to be paid all parties interested in the property sought to be appropriated.

The respondents, within five days after the entry of the orders, pursuant to Rem. Rev. Stat., § 894 [P. C. § 7664], applied to this court for a writ of certiorari for the purpose of reviewing the orders entered, and, this court having granted the writ and the records in the several cases having been certified by the respondent judge, the cases are before us for review.

Briefs have been filed by relators and by the respondent, and the cases have been consolidated for hearing before this court.

Relators assign error upon the entry by the superior court of the orders adjudicating public use, and upon the admission over relator's objection of certain testimony offered by the state in support of its petition.

Briefly stated, the facts leading up to the initiation of this proceeding are as follows: In 1913, the state imported elk into several sections of this state apparently suited for those animals. Since that time, the elk have multiplied to such an extent that it is now agreed by the state authorities

that there are too many elk for the range available. It is also agreed that during cold winters the elk, not being able to find sufficient browse in the mountain areas, descend from the heights into the orchard country, where they do great damage to fruit trees and crops. As a result of damage by the elk, the state legislature, by Laws of 1943, chapter 285, p. 903, appropriated $60,000 to pay claims presented by orchard owners whose property had been injured by depredations of the elk. With the idea of relieving this situation, the officers of the state game commission caused this proceeding to be instituted by the attorney general of the state of Washington, seeking to exercise the right of eminent domain for the purpose of condemning certain land alleged to be necessary as a game refuge, it being believed that the land condemned would provide a winter range and refuge for the "Oak creek herd of elk," and would prevent that herd from doing damage to neighboring orchards.

By the orders now before us for review, the trial court found that the director of game had been unable to acquire by purchase the property sought to be condemned.

Rem. Rev. Stat. (Sup.), § 5889 [P. C. § 2620], reads in part as follows:

"The director of game shall have the power and authority to acquire by gift, or, *whenever funds are appropriated for such purpose, by purchase, lease or condemnation* in the manner provided by law for condemnation of property for public use, such lands, . . . as may be deemed necessary for the use of said commission . . . [Then follows a list of objects for which such power may be exercised.]" (Italics ours.)

From this section it seems clear that, before the director of game may institute an action for the purpose of exercising the right of eminent domain, the legislature must first make a specific appropriation of money for that purpose.

It is not alleged in the notices for condemnation filed in the proceedings now before us for review that the legislature had appropriated money for the purpose of condemning the lands described in the respective notices. The question that condemnation proceedings could not be maintained

without a prior legislative appropriation, and that in the respective proceedings no such appropriation had been made, was apparently not suggested at the hearing before the superior court. This matter, however, has been briefed by the respective parties, after the granting of the writ of certiorari by this court.

As we are of the opinion that this question is decisive of the matter, no other question need be discussed.

At its session in 1943, the legislature several times had occasion to consider questions connected with the elk which had been imported, as above set forth.

Laws of 1943, chapter 237, p. 711, referred to this matter, and to the damage inflicted by the elk upon agricultural and other crops, § 2 of the act reading as follows:

"In order to reduce to a minimum, damage inflictions by deer and elk upon cultivated agricultural and horticultural crops, and to pay for such damage claims as the Commission may deem just the State Game Commission is hereby authorized and empowered in its discretion to enter into cooperative agreements with agricultural and horticultural farmers or associations of farmers in the matter of deer and elk damage and of their herding and feeding, and for the erection and maintenance of such fencing facilities as will tend to prevent the access of deer and elk to such crops. To carry out the provisions of this section there is hereby appropriated to the State Department of Game out of the State Game Fund the sum of one hundred thousand dollars ($100,000) or so much thereof as may be necessary."

Laws of 1943, chapter 165, p. 553, deals at considerable length with the matter of game management, with particular reference to deer and elk, and provides for the appointment of a legislative committee to investigate existing game problems, and make a report, with recommendations, concerning legislation for consideration by the 1945 session of the legislature.

By Laws of 1943, chapter 202, p. 612, the general appropriation act, money was appropriated for the conduct of the state government for the succeeding biennium. By § 1 of the act, money was appropriated for payment of salaries, for the operation of state institutions, and for other

purposes, including "for purposes specified in certain acts of Congress." Section 2 of the act defines certain words and phrases, the first paragraph thereof reading as follows:

"The words 'capital outlay' whenever used in this act, shall mean and include the purchase and improvement of land and erection of buildings, including necessary salaries and wages incident thereto."

Included among the many appropriations made are two from the game fund, the first (p. 621):

"FROM THE GAME FUND . . .
"Wild Life Restoration and Research (Expenditures to be limited to approved projects upon which reimbursement of 75% will be made by the Federal Government) ............................. $100,000.00"

the second (p. 628), following the heading (p. 627):

"For Capital Outlays, Major Repairs and Maintenance:
"To be expended independently of, or in conjunction with funds allocated by the Federal, County or Municipal Governments or Agencies or in conjunction with funds allocated for unemployment relief: *Provided,* That the following appropriations shall become available only upon written approval of the Governor,
"FROM THE GAME FUND.
"For the Department of Game:
Capital Outlays and Major Repairs..... $150,000.00"

By Laws of 1943, chapter 285, p. 903, a supplemental appropriation act, the legislature defined "capital outlay" as in the general appropriation act, *supra,* and, *inter alia,* appropriated the amount of $60,000 to pay claims arising from the depredations of the elk above referred to.

The attorney general frankly admits that the $100,000 appropriated by Laws of 1943, chapter 237, *supra,* may not be used for the purpose of condemning land or other property, arguing, however, that the general and supplemental appropriations above referred to are available to pay for lands and property condemned at the instance of the director of game, because of certain Federal statutes and appropriations by the Congress, made for the purpose of assist-

ing the states in carrying out projects for the preservation and conservation of wild life. The Pittman-Robinson act (50 Stat. 917, 16 U. S. C. A. § 669) established a Federal wild life restoration fund, to be expended in aiding the states in carrying out various projects for the purpose of restoring wild life, when any state legislature shall have assented to the terms of the Federal act. Section 2 of the statute referred to (16 U. S. C. A. § 669a) reads as follows:

"For the purposes of this Act the term 'wildlife-restoration project' shall be construed to mean and include the selection, restoration, rehabilitation, and improvement of areas of land or water adaptable as feeding, resting, or breeding places for wildlife, including acquisition by purchase, condemnation, lease, or gift of such areas or estates or interests therein as are suitable or capable of being made suitable therefor, and the construction thereon or therein of such works as may be necessary to make them available for such purposes and also including such research into problems of wildlife management as may be necessary to efficient administration affecting wildlife resources, and such preliminary or incidental costs and expenses as may be incurred in and about such projects."

Laws of 1939, chapter 140, p. 420, § 1, reads as follows:

"The State of Washington hereby assents to the purposes and provisions of that certain Act of Congress entitled: 'An act to provide that the United States shall aid the States in wildlife-restoration projects, and for other purposes,' approved September 2, 1937 (Public, No. 415, 75th Congress), and the State Department of Game is hereby authorized, empowered and directed to perform such acts as may be necessary to establish and conduct cooperative wildlife-restoration projects, as defined in said Act of Congress, in compliance with said act and with rules and regulations promulgated by the Secretary of Agriculture thereunder."

Pursuant to this statute, money was expended in establishing the Oak creek elk herd, the Federal government cooperating pursuant to the Pittman-Robinson act, and the condemnation which is the subject matter of this proceeding would be an extension of the Oak creek project. It appears that the project has already been approved by the

necessary Federal authorities, who have agreed that Federal funds will be made available to pay a portion of the cost of the condemnation and subsequent improvements.

■ Laws of 1939, chapter 140, contains no repealing clause, and Rem. Rev. Stat. (Sup.), § 5889, *supra*, remains in full force and effect, unless repealed by implication.

The two acts are nowise inconsistent. Since 1933, the director of game has enjoyed the power to condemn land *when the legislature has appropriated funds for that purpose*, and that power is still vested in the director. This power, however, by § 5889, *supra*, is limited to condemnations for which the legislature has made a prior appropriation of funds. This limitation is not affected in any way by Laws of 1939, chapter 140, *supra*, by which the legislature assented to the Federal statute. Any condemnation proceeding under that act, or otherwise, must be made in accordance with the existing statutes of the state providing for the condemnation of property.

■ Repeals by implication are not favored (*In re Sanford*, 10 Wn. (2d) 686, 118 P. (2d) 179), and we have repeatedly held that, when two or more statutes deal with the same subject matter, they will be construed together.

In the case of *Kruesel v. Collin*, 171 Wash. 200, 17 P. (2d) 854, we said:

"It is a cardinal rule of statutory construction that, where there are two or more statutes dealing with the same subject, they will be construed so as to maintain the integrity of both. Repeal by implication is not effected unless the terms of the later act are irreconcilable with the first."

In the case of *State ex rel. Washington Mut. Sav. Bank v. Bellingham*, 183 Wash. 415, 48 P. (2d) 609, appears the following:

"In considering different statutes enacted by the same legislative authority, all relating to the same subject matter, the entire sequence should be considered in placing a judicial construction upon any one of the acts."

In the recent case of *Buell v. McGee*, 9 Wn. (2d) 84, 113 P. (2d) 522, we said:

"A conceded general rule of statutory construction is that, where there are provisions relating to the same subject matter embodied in different statutes, they should be harmonized so as to maintain the integrity of both whenever it is possible."

Rem. Rev. Stat. (Sup.), § 5889, and Laws of 1939, chapter 140, § 1, both above quoted, may logically be construed together and effect given to both. The earlier act vests the department of game with the power to condemn, stating the condition under which that power may be exercised; namely, the prior legislative appropriation of money for that specific purpose. By the act of 1939, the legislature availed itself of the offered cooperation of the Federal government in the particulars mentioned, but left § 5889 in full force and effect. From the latter section, the legislative intent to authorize condemnations for the benefit of the department of game only after the legislature has made a specific appropriation of money for the purpose of condemning property, clearly appears.

From the numerous references to the department of game found in the laws enacted during the legislative session of 1943, several of which refer to the herds of elk whose increase and depredations have given rise to this action, it must be recognized that the legislature had that particular phase of our wild life clearly brought before it. That is emphasized by the fact that the legislature, by Laws of 1943, chapter 165, *supra,* provided for a legislative committee to investigate existing game problems, including the elk problem, and report its recommendations prior to the 1945 legislative session.

Had the legislature desired to authorize the condemnation of land by the department of game, it would have been a very simple matter to have made such an appropriation. By the 1943 general appropriation act (chapter 202, *supra*), the legislature defined the words "capital outlay" as including "the purchase and improvement of land," but did not include the condemnation of land within the definition. The only appropriation for the benefit of the game fund to be ex-

pended, *inter alia,* for capital outlays is the part of the act last referred to in the appropriation of $150,000 for the purposes mentioned. As set forth in the act, in the portion thereof above quoted, this appropriation becomes available "only upon written approval of the governor," and it nowhere appears that the governor has ever approved any expenditures from the money appropriated from the game fund. Until this approval is secured, no funds are available to the director of game even for the purchase of land upon agreement.

Even if the governor had approved expenditures from the appropriation for capital outlays, the money would not be available for use in condemning property, as the legislature had not appropriated funds for that particular purpose.

The fact that the Federal statute makes Federal funds available, *inter alia,* for condemnation of land, and that, as above set forth, the legislature in 1939 formally assented to the Federal statute, affords no basis for holding that the legislative limitation upon the power of the director of game to initiate proceedings for condemnation of property and expend state funds therefor has been enlarged.

The general statute relating to the exercise of the power of eminent domain is found in Laws of 1911, chapter 64, p. 335, and appears as Rem. Rev. Stat., § 891 [P. C. § 7661] *et seq.* Speaking generally, the statute provides that, when any officer, board, etc., representing the state, is empowered to purchase land, and is unable to agree with the owner thereof as to the terms of such purchase, condemnation proceedings may be instituted in the manner provided by the act. This statute was in effect when the legislature enacted Laws of 1933, chapter 3, p. 41, § 34 thereof (Rem. Rev. Stat. (Sup.), § 5889, *supra*) amending § 35 of chapter 178, p. 494, Laws of 1925, Ex. Ses., the game code. By § 35, chapter 178, Laws of 1925, Ex. Ses., county game commissions were authorized to acquire property by condemnation, in the manner provided by law, without prior legislative appropriation of money for that purpose. That limi-

tation was added by the legislature in 1933, and indicates a legislative intention so to restrict the authority of the director. If, in enacting this section, the legislature had omitted the words "lease or condemnation," the appropriation made by the legislature in 1943 would have been available for condemnation purposes, as the definition of the phrase "capital outlay," as defined by the legislature, includes the purchase of land. As the law at present exists, however, if it is desired that the director of game condemn property to carry out departmental purposes, a specific legislative appropriation of funds for that purpose must first be available.

■ The right to exercise the power of eminent domain is one of the highest powers exercised by the sovereign. This right will not be implied, nor will it be extended beyond express statutory authority. The law is clearly stated in 1 Lewis on Eminent Domain (3d ed.), p. 679, § 371, as follows:

"The exercise of the power being against common right, it cannot be implied or inferred from vague or doubtful language, but must be given in express terms or by necessary implication. When the right to exercise the power can only be made out by argument and inference, it does not exist. 'There must be no effort to prove the existence of such high corporate right, else it is in doubt; and, if so, the State has not granted it.' If the act is silent on the subject, and the powers given by it can be exercised without resort to condemnation, it is presumed that the legislature intended that the necessary property should be acquired by contract."

and p. 708, § 388:

"All grants of power by the government are to be strictly construed, and this is especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other. 'An act of this sort,' says Bland, J., 'deserves no favor; to construe it liberally would be sinning against the rights of property.' But, as in other cases, such a construction will, if possible, be given to an act as will carry into effect the chief and

manifest purpose for which it was passed, and such as will give effect to all its words. It will be so construed as to support its validity rather than otherwise. 'Statutes granting these powers are not to be construed so literally, or so strictly as to defeat the evident purpose of the legislature. They are to receive a reasonably strict and guarded construction, and the powers granted will extend no further than expressly stated, or than is necessary to accomplish the general scope and purpose of the grant. If there remains a doubt as to the extent of the power, after all reasonable intendments in its favor, the doubt should be solved adversely to the claim of power.' "

In the text cited, the distinguished author summarized the decision of the court in the case of *People ex rel. Hayden v. Rochester*, 50 N. Y. 525, as follows: (p. 681, § 371)

"In another case, where commissioners were empowered to select a site for a city hall, either certain lands owned by the city or any other lands, and to cause a city hall to be erected thereon, it was held by the Court of Appeals of New York, that, in case land not owned by the city had been selected, there would have been no power to condemn, and, if the commissioners could not have agreed with the owner, they could have proceeded no further in the matter."

From the foregoing references to the session laws of 1943, it appears beyond question that the legislature had its attention drawn in a most definite and particular manner to the existing difficulties in connection with the herds of elk. By chapter 165, the legislature referred to deer and elk and the damage which they had committed, and appointed an interim committee to study the problem. By chapter 237, the game commission was authorized to enter into cooperative agreements with farmers concerning "the matter of deer and elk damage," etc., while by chapter 285, $60,000 was appropriated to pay damage claims based upon depredations committed by the elk herds.

The legislature has appropriated no funds for the purpose for which the condemnations now before us were instituted, and we hold that consequently no right existed on the part of the state to initiate the proceedings. This

being true, the trial court erred in entertaining jurisdiction of the matter, and in entering the orders adjudicating public use which are before us for review. These orders are accordingly reversed, with directions to dismiss the proceedings.

SIMPSON, C. J., STEINERT, JEFFERS, and GRADY, JJ., concur.

March 4, 1944. Petition for rehearing denied.