[No. 37149.    En Banc.    February 18, 1965.]

THE CITY OF TACOMA, *Petitioner*, v. GEORGE WELCKER *et al.*,
*Respondents.**

*Reported in 399 P. (2d) 330.

*Marshall McCormick, Paul J. Nolan, Irving J. Kelsey,* and *Argal D. Oberquell,* by *Paul J. Nolan,* for petitioner.

*Bell, Ingram & Smith, Lewis A. Bell, Cummings & Harris, Theodore Cummings, Charles O. Carroll,* and *William L. Paul, Jr.,* for respondents.

HAMILTON, J.—The city of Tacoma, a municipality of the first class, situate in Pierce County, initiated this action in eminent domain seeking to acquire fee simple title to some 1,450 acres of land contiguous to the Green River in King County. The asserted purpose of the proposed acquisition is to protect the municipality's domestic and industrial water supply from pollution. The trial court refused to enter an order of public use and necessity and dismissed

the city's petition with prejudice. The city was granted a writ of certiorari to review the trial court's action.

Since 1913, when the city of Tacoma acquired the right to divert water from the Green River, the Green River watershed has become the city's principal source of domestic water. Through the years the city has invested approximately $15,000,000 in developing the facilities by which water is diverted from the river and transported, by means of a gravity pipe line, into a storage reservoir and thence into the distribution lines serving consumers residing in the city and portions of southern King County. The capacity of the present facilities is some 73,000,000 gallons of water per day, and, at the time of the hearing before the trial court, the system was serving approximately 250,000 domestic and industrial users.

The Green River watershed comprises a remote and practically uninhabited area in the Cascade Range of approximately 148,000 acres, all of which is situated in King County. Except for some logging operations, the construction and maintenance of the Howard Hanson Dam, the erection of electrical transmission lines, the traversion of a railroad, and the existence of the railroad community of Lester, there has been and is very little human activity carried on within the watershed area. In fact, the permanent population of the area has steadily declined from some 650 people in 1930, to 197 in 1960. Estimates of a future increase in permanent population are pessimistic. At the time of the trial, the watershed area was zoned as "residential-agricultural"; however, the director of the King County Planning Commission testified that a more fitting classification would be that of "forest recreation."

The bulk of the acreage within the watershed is owned by governmental agencies, the Northern Pacific Railroad Company, and timber, veneer, and pulp companies. Agreements dealing with minimization of water contamination have been negotiated between the city and such owners. The remaining acreage is owned, generally in smaller parcels, by individuals, most of whom are parties to this suit,

with whom the city has no agreements relating to pollution control.

The natural purity of the raw water derived from the watershed has heretofore and at the present time enabled the city of Tacoma to provide palatable water, suitable and safe for human consumption, by the relatively inexpensive process of chlorination. Recourse to filtration systems required in other parts of the country has not been necessary. The estimated cost of installing such a system, which would be capable of meeting present and prospective water requirements, is approximately $5,000,000 with an annual maintenance expense of $500,000.

By this action, the city of Tacoma seeks to acquire parcels from the watershed area lying largely within one-half mile of the Green River, and upstream from the city's water diversion point. These particular parcels are disconnected and disparately located along the banks of the river. The city officials testified that this suit is one of a series of actions, designed to implement a plan, which will ultimately give the city ownership and control over a "buffer strip" and "surface filter blanket" one-half mile in depth on each side of the river, thus providing protection against pollution of the waters and minimizing the necessity of installing a filtration plant. The city has heretofore, by purchase and condemnation, acquired other like parcels along the river and in the area of the impoundment reservoir behind the Howard Hanson Dam, and is prosecuting a companion action to this against Weyerhaeuser Timber Company whereby similar river bank acreage would be acquired.

The instant action was initiated pursuant to Tacoma City Ordinance No. 17194, passed by the city council on October 23, 1962, based upon a resolution of the city's public utility board declaring, in substance, a necessity for acquisition of the properties here involved for the continuing protection of the water supply from pollution.

The city predicates its right to proceed by condemnation upon the provisions of RCW 8.12.030 and 35.92.010, the pertinent portions of which are as follows:

"Every city and town . . . is hereby authorized and empowered . . . to condemn land or property, or to damage the same, either within or without the limits of such city . . . for aqueducts, reservoirs, pumping stations and other structures for conveying into and through such city a supply of fresh water, and *for the purpose of protecting such supply of fresh water from pollution,* and to condemn land and other property and damage the same for such and for any other public use after just compensation having been first made or paid into court for the owner in the manner prescribed by this chapter." (Italics ours.) RCW 8.12.030.

"A city or town may construct, condemn and purchase, purchase, acquire, add to, maintain and operate waterworks, within or without its limits, for the purpose of furnishing the city and its inhabitants, and any other persons, with an ample supply of water for all purposes, public and private . . .

"For such purposes any city or town may take, condemn and purchase, purchase, acquire, and retain water from any public or navigable lake or watercourse, surface or ground, and, by means of aqueducts or pipe lines, conduct it to the city or town; . . . and for all the purposes of erecting such aqueducts, pipe lines, dams, or waterworks or other necessary structures in storing and retaining water, or for any of the purposes provided for by this chapter, the city or town may occupy and use the beds and shores up to the high water mark of any such watercourse or lake, and acquire the right by purchase, or by condemnation and purchase, or otherwise, to any water, water rights, easements or privileges named in this chapter, or necessary for any of said purposes, *and the city or town may acquire by purchase or condemnation and purchase any properties or privileges necessary to be had to protect its water supply from pollution.* Should private property be necessary for any such purposes or for storing water above high water mark, the city or town may condemn and purchase, or purchase and acquire such private property." (Italics ours.) RCW 35.92.010.

At the hearing upon the city's petition for an order adjudicating public use and necessity, the city introduced evidence the gist of which was that (1) a close relationship exists between human presence and activity in the watershed area and the bacteriological quality of the water

diverted into the city's water system; (2) improved access roads, recreational attraction of the Howard Hanson Dam reservoir, and expanding land development programs portend increasing human activity within the watershed area; and (3) the "buffer-strip" plan is a minimal pollution control and preventative measure, and constitutes a reasonable alernative to (a) future installation of a filtration system or (b) acquisition of the entire watershed area. The city did not, before the trial court or before this court on appeal, contend that at the present time there is an excessive amount of human activity or resultant pollution in the area. Its position is that the acquisitions sought constitute a necessary and reasonable hedge against the future.

On the other hand, respondents in opposition to the city's petition introduced evidence to the effect that (1) the parties to this action are not now utilizing their lands in such a manner as to constitute a threat of water pollution; (2) since 1913, despite spasmodic increases in human activity within the watershed area, the city's chlorination process has provided effective protection; (3) continued enforcement of existing pollution laws and regulations will provide satisfactory protection now and in the foreseeable future; (4) the chief threat of pollution arises from the existence of the railroad line, the community of Lester, and logging activities in the watershed area; and (5) the one-half mile "buffer-strip" concept is, under the circumstances, unfeasible and does not constitute a reasonable alternative to acquisition of the entire watershed area, including the railroad, or to installation of a filtration system.

In dismissing the city's petition, the trial court, in essence, found that there was neither presently nor in the foreseeable future any condition of pollution arising from the use of the particular lands sought to be acquired in this action, and concluded therefrom that the city's action in seeking to condemn such lands was arbitrary, capricious, mistaken, and constructively fraudulent.

Before proceeding into a consideration of the arguments advanced for and against the trial court's action, we deem it appropriate to set forth certain guiding principles.

(1) The power of eminent domain is an attribute of sovereignty. It is an inherent power of the state, not derived from, but limited by, the fundamental principles of the constitution. *Miller v. Tacoma*, 61 Wn. (2d) 374, 378 P. (2d) 464 (1963); *King Cy. v. Theilman*, 59 Wn. (2d) 586, 369 P. (2d) 503 (1962). A municipal corporation does not have the inherent power of eminent domain. It may exercise such power only when it is expressly so authorized by the state legislature. *State ex rel. Tacoma School Dist. No. 10 v. Stojack*, 53 Wn. (2d), 55, 330 P. (2d) 567, 71 A.L.R. (2d) 1064 (1958); *Tepley v. Sumerlin*, 46 Wn. (2d) 504, 282 P. (2d) 827 (1955). Although a legislative grant of such power to a municipality is to be strictly construed, it is not to be construed so strictly as to defeat the evident purpose of the grant. *State ex rel. Chesterley v. Superior Court*, 19 Wn. (2d) 791, 144 P. (2d) 916 (1944).

(2) The furnishing of pure and wholesome domestic water by a municipality to its inhabitants constitutes a public use within the contemplation of the law of eminent domain. *State ex rel. Shropshire v. Superior Court*, 51 Wash. 386, 99 Pac. 3 (1909); *Langdon v. Walla Walla*, 112 Wash. 446, 193 Pac. 1 (1920); *State ex rel. Dungan v. Superior Court*, 46 Wn. (2d) 219, 279 P. (2d) 918 (1955). And, protection and preservation of the purity and quality of a public water supply, either by restrictions unduly impairing riparian rights or by perimeter acquisitions, likewise constitutes a public use and an exercise in eminent domain. *In re Clinton Water Dist.*, 36 Wn. (2d) 284, 218 P. (2d) 309 (1950); *Bowden v. York Shore Water Co.*, 114 Me. 150, 95 Atl. 779 (1915); *Tulsa v. Williams*, 100 Okla. 116, 227 Pac. 876 (1924); *Rowell v. City of Lawton*, 143 Okla. 203, 288 Pac. 344 (1930); *Truitt v. Borough of Ambridge Water Authority*, 389 Pa. 429, 133 A. (2d) 797 (1957); *Pearl River Valley Water Supply Dist. v. Brown*, 248, Miss. 4, 156 So. (2d) 572 (1963), cert. den. 376 U. S. 970, 12 L. Ed. (2d) 84, 84 S. Ct. 1136.

(3) The word "necessary," when used in or in connection with eminent domain statutes, means reasonable necessity, under the circumstances of the particular case.

*State ex rel. Lange v. Superior Court,* 61 Wn. (2d) 153, 377 P. (2d) 425 (1963). It does not mean absolute, or indispensible, or immediate need, but rather its meaning is interwoven with the concept of public use (*King Cy. v. Theilman, supra*) and embraces the right of the public to expect and demand the service and facilities to be provided by a proposed acquisition or improvement. *State ex rel. Ami Co. v. Superior Court,* 42 Wash. 675, 85 Pac. 669 (1906); *State ex rel. Jones v. Superior Court,* 44 Wash. 476, 87 Pac. 521 (1906); *State ex rel. Wilson v. Superior Court,* 47 Wash. 397, 92 Pac. 269 (1907); *State ex rel. Patterson v. Superior Court,* 102 Wash. 331, 173 Pac. 186 (1918). Reasonable necessity for use in a reasonable time is all that is required. *Spokane v. Merriam,* 80 Wash. 222, 141 Pac. 358 (1914); *State ex rel. Wenatchee-Beebe Orchard Co. v. Superior Court,* 57 Wn. (2d) 662, 359 P. (2d) 146 (1961).

(4) Under the provisions of Const. Art. 1, § 16 (amendment 9) and our interpretation thereof, the issue of whether a proposed acquisition be really for a public use is solely a judicial question, although a legislative declaration thereof will be accorded great weight. *Miller v. Tacoma, supra,* and cases cited. On the other hand, the issue of whether the contemplated acquisition is necessary to carry out the proposed public use presents a legislative question, and a declaration of necessity by the appropriate legislative body will, by the courts, be deemed conclusive, in the absence of proof of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. *Medical Lake v. Brown,* 63 Wn. (2d) 41, 385 P. (2d) 387 (1963), and cases cited.

(5) Arbitrary and capricious conduct is willful and unreasoning action, without consideration and regard for facts or circumstances. *Lillions v. Gibbs,* 47 Wn. (2d) 629, 289 P. (2d) 203 (1955). Action, when exercised honestly, fairly, and upon due consideration is not arbitrary and capricious, even though there be room for a difference of opinion upon the course to follow, or a belief by the reviewing authority

that an erroneous conclusion has been reached. *Smith v. Hollenbeck*, 48 Wn. (2d) 461, 294 P. (2d) 921 (1956).

Against the backdrop of the foregoing principles, none of which is seriously challenged by any of the parties, the fundamental question presented for our review is whether the city may exercise its grant of the power of eminent domain, as contained in RCW 8.12.030 and 35.92.010, over the particular properties here in issue, absent evidence of an immediate danger of water contamination from such properties.

Essentially, respondents contend that there must exist a present danger coupled with a foreseeable threat of pollution from the use of their particular lands before the city may condemn, otherwise condemnation at this time is unnecessary and constitutes arbitrary and capricious action. The city, on the other hand, asserts that pollution prevention and control is an ever present problem in any domestic water supply system, and it is naught but good judgment to presently initiate and implement a long-range plan to insure a continuing supply of wholesome water. Thus, the city contends, its "buffer-strip" plan is reasonable and its declaration of necessity in the instant case cannot be characterized as arbitrary and capricious.

We agree with the city.

It can hardly be gainsaid that pollution prevention and control is an integral part of any domestic water supply system. The public has a right to expect and demand such protection and it becomes the duty of any agency undertaking to supply water for human consumption to adopt and apply adequate measures against contamination of the water. Such an agency cannot await the onset of an epidemic before acting. Neither should it be required to proceed on a cause by cause basis.

The evidence presented in the instant case indicates prevention and control of water contamination, generally, may be accomplished, in varying degrees, by the utilization of one or more measures, *i.e.*, chlorination, antipollution laws and regulations, buffer-zone acquisition and control, watershed isolation or acquisition, and filtration. Each method

has its adherents among the experts, and each its own degree of success.

The evidence further indicates that the public officials and legislative body of the city of Tacoma, in evaluating their present and future domestic water supply, gave consideration to current population trends, intensifying pressures for land development and usage, expanding recreational demands, increasing accessibility to isolated mountain areas, the relationship of fresh water contamination and human activity in a watershed area, and the advantages and disadvantages of the various methods of pollution control. Based upon these considerations, the city council determined that a present need exists for improving the city's water system by added precautions against a discernible threat of pollution. Accordingly, it adopted a plan embracing utilization of the chlorination, regulatory, and buffer-zone methods of pollution prevention and control, and directed an orderly implementation thereof.

The fact that the water now being supplied by the city is potable and does not exceed tolerable contamination levels, or that such contamination as presently exists cannot be traced to the usage of the lands here involved, in nowise detracts from the wisdom or present necessity of providing reasonable safeguards against a reasonably realistic and foreseeable future danger of contamination. A "stitch in time" has never been considered capricious. And, the fact that expert witnesses may disagree as to the desirability of one method of protection, as opposed to another, does not perforce render the choice of one arbitrary.

In our opinion, the proposed acquisition is for a public use, within the contemplation of the law of eminent domain and the provisions of RCW 8.12.030 and 35.92.010, and the city council's proclamation of necessity for improvement of the city's water system in accordance with the plan as here presented is not arbitrary and capricious. The trial court erred in concluding otherwise.

In addition to their primary contention of arbitrary and capricious action, respondents urge three procedural mat-

ters which they assert warrant and support the judgment of dismissal.

First, it appears that, through some oversight, the city, in seeking to comply with RCW 8.12.060,[1] served its petition for condemnation with the wrong authorizing ordinance attached. At the commencement of the hearing, the city moved to amend its petition to include the proper ordinance. Respondents did not allege surprise, assert prejudice, or seek a continuance. In fact, when queried by the trial court, it appeared that respondents, through counsel, were aware of the defect even prior to the time the petition was served. The trial court accordingly permitted the amendment, and the proper ordinance was subsequently introduced into evidence. Respondents reserved their objection, and now contend the defect was jurisdictional and fatal to the proceeding.

■ Compliance with the provisions of RCW 8.12.060, requiring a certified copy of the authorizing ordinance be attached to the petition, is a statutory requisite to proceeding with the condemnation hearing. The basic purpose of the requirement is to acquaint the condemnee and the court with the nature and extent of the authority under which the municipal condemnor is proceeding. This requirement, however, is not jurisdictional in the sense that an infirmity therein cannot be corrected by timely and appropriate amendment. *State ex rel. Oregon-Washington Water Ser. Co. v. Hoquiam,* 155 Wash. 678, 286 Pac. 286, 287 Pac. 670 (1930); *State ex rel. Willapa Elec. Co. v. Superior Court,* 196 Wash. 523, 83 P. (2d) 742 (1938); *Cf. In re Seattle,* 56 Wn. (2d) 541, 353 P. (2d) 955 (1960).

The trial court did not err in permitting the amendment.

Secondly, respondents assert that the authorizing ordi-

---

[1] "Such petition shall contain a copy of said ordinance, certified by the clerk under the corporate seal, a reasonably accurate description of the lots, parcels of land and property which will be taken or damaged, and the names of the owners and occupants thereof and of persons having any interest therein, so far as known, to the officer filing the petition or appearing from the records in the office of the county auditor." RCW 8.12.060.

nance did not properly pledge the general credit of the city to compensate owners for the proposed acquisition, in derogation of the requirements of RCW 8.12.040.[2] In this regard, it will be observed that the ordinance in question reads:

"Section 3. That the costs of said acquisition are estimated to be $400,000.00, and payment for the property herein ordered to be taken or damaged shall be made from the allocated current funds of the Water Division, Department of Public Utilities, or *any other funds available for such purposes.*" (Italics ours.)

Although this provision is not worded in the precise language of the statute, we deem it a sufficient compliance with the requirements of the statute. *Cf. State ex rel. Dungan v. Superior Court, supra.* Under the accounting procedures required by the city charter of the city of Tacoma, there was a sufficient pledge of credit which would entitle the city to commence this action.

Finally, respondents urge that the "buffer-zone" method of protecting the water supply from pollution does not constitute an improvement or betterment of the water system within the contemplation of RCW 8.12.040 or the provisions of the charter of the city of Tacoma.

We disagree.

RCW 8.12.030 and 35.92.010 authorize municipalities to condemn property for the purpose of protecting their supply of domestic water. The fact that RCW 8.12.040 and, in this instance, pertinent city charter provisions speak in terms of "improvements," "additions," or "betterments" to the water system does not limit a city's power to any one method of pollution protection, or require that the city place a physical structure upon lands acquired for such purpose. If the method adopted and the lands sought are properly

---

[2] "When the corporate authorities of any such city shall desire to condemn land or other property, or damage the same, for any purpose authorized by this chapter, such city shall provide therefor by ordinance, and unless such ordinance shall provide that such improvement shall be paid for wholly or in part by special assessment upon property benefited, compensation therefor shall be made from any general funds of such city applicable thereto. . . ." RCW 8.12.040.

689

found to be reasonable and necessary to effectively accomplish pollution control over a given water system, it would be incongrous to hold such did not constitute an improvement, addition or betterment to such system.

The judgment of dismissal is reversed, and the cause is remanded for entry of an order of public use and necessity.

ALL CONCUR.

---

March 25, 1965. Petition for rehearing denied.