THE STATE OF WASHINGTON, *on the Relation of Wickes A.
Devonshire et al., Petitioner,* v. THE SUPERIOR COURT
FOR KING COUNTY *et al., Respondents.**

*Short, Cressman & Cable* and *Douglas R. Hartwich,* for
petitioner.

*A. L. Newbould, G. Grant Wilcox,* and *Jorgen G. Bader,*
for respondents.

Reported in 424 P.2d 913.

HAMILTON, J.—A writ of certiorari brings here for review an order of public use and necessity. The order was entered in an eminent domain proceeding initiated by the city of Seattle as a result of its acquisition of an interest in the monorail system constructed in connection with the Century 21 Exposition of 1962.

The background facts can be briefly stated. In 1961, the city of Seattle, by appropriate action, authorized Alweg International, Inc., Century 21 Exposition, Inc., and Howard S. Wright, a construction contractor, to construct, operate, and maintain an elevated monorail transit system upon and over designated streets from downtown Seattle to the Century 21 Exposition grounds. Such a system was authorized, constructed, and commenced operations in furtherance of and with the opening of the exposition.

Construction of the system embraced the installation of some 55 cement columns along and upon 5th Avenue and 5th Avenue North within the city. These columns support two large beams upon which two four-car trains travel on their respective rails at relatively high speeds. To permit the proper gradation of a curve at the junction of 5th Avenue and 5th Avenue North, the operational design of the system required an overhang of adjacent premises owned by relators. Relators, accordingly, agreed to and did execute a lease of a temporary "aerial easement" over portions of the one-story building and two lots comprising their premises.

The initial authorization from the city for the operation and maintenance of the monorail system was for the duration of the exposition and 6 months thereafter. Relators' temporary easement was to expire upon removal of the system and, in any event, no later than July 21, 1963. Since conclusion of the exposition in late 1962, however, the exposition grounds, with many of its buildings and facilities, have become a civic enterprise known as the Seattle Center which receives many visitors and accommodates numerous community activities. In furtherance of the enterprise and to relieve traffic congestion, the city has twice extended its

authorization for the operation of the monorail system. Relators also extended their temporary aerial easement, with options, to expire in 1968.

In the meantime, and pursuant to Seattle City Ordinance No. 93677, duly enacted and filed on March 16, 1965, the city acquired the monorail system by purchase and conveyance from Century 21 Center, Inc., a nonprofit service corporation, which had succeeded Alweg International, Inc., and Century 21 Exposition, Inc. Since the acquisition the city has undertaken to maintain and continue the monorail system in existence as an adjunct of the Seattle Center. Accordingly, and pursuant to Seattle City Ordinance No. 93917, enacted, approved, and filed as of June 3, 1965, the city commenced this action to acquire by condemnation such further properties, rights, and privileges, including a permanent aerial easement over relators' premises, as may be necessary to the continued operation of the system.

The city's petition in condemnation includes some 82 parcels or property interests along the route of the monorail. A number of these interests were represented at the hearing on public use and necessity. Some objected to the entry of the challenged order, and some did not. Only relators have sought a review of the order entered, which, after adjudicating the issue of public use and necessity, provided with respect to relators' property (Parcel 64):

> [T]hat this order adjudicating public use and necessity shall not be deemed to be determinative of contractual rights or duties incident to or arising from certain easements and agreements marked for identification as Respondents' Exhibits 6, 7, 8 and 10 with respect to the operation of the Monorail to which the City of Seattle and/or those persons having an interest in Parcel 64 are in privity, which easements and agreements shall be considered at pre-trial conferences pursuant to further order of this Court, or be the subject of separate litigation.

Relators launch a three-prong attack against the trial court's adjudication of public use and necessity. They assert (1) the city of Seattle, a city of the first class, lacks statu-

tory authority to condemn property and property rights for a monorail system; (2) there was no evidence presented showing public use and necessity for a change from a temporary to a permanent monorail system; and (3) the city is estopped by the terms of the lease permitting a temporary aerial easement over relators' property.

At the outset, it should be observed that relators do not question the propriety of the city's acquisition and operation of the monorail system. Instead, in pursuit of their first contention, relators assert that the city lacks statutory authority to condemn private property or easements to permit continued or permanent operation of the system. In support of this assertion, they point to RCW 8.12.030, the statute under which the city is proceeding with condemnation, and argue that such statute contains no explicit authorization regarding condemnation for monorail systems.

The city, on the other hand, contends that it derives its power to condemn the easement in question from a reading of RCW 8.12.030 in conjunction with RCW 35.22.280 (6) and RCW 35.22.305.

We are in accord with the city's view of the issue.

■ It is undoubtedly the accepted rule in this state that statutes which delegate the state's sovereign power of eminent domain to its political subdivisions are to be strictly construed, and that a power so conferred must be granted in express terms or by necessary implication. *King Cy. v. Seattle,* 68 Wn.2d 688, 414 P.2d 1016 (1966); *Tacoma v. Welcker,* 65 Wn.2d 677, 399 P.2d 330 (1965); *Seattle v. State,* 54 Wn.2d 139, 338 P.2d 126 (1959). However, as we pointed out in *Tacoma v. Welcker, supra,* a statutory grant of such power is not to be so strictly construed as to thwart or defeat an apparent legislative intent or objective.

With these principles in view, we turn to the existing statutory situation.

■ The legislature, by the provisions of RCW 35.60 concerning world fairs, initially passed in 1961, authorized active and material municipal participation in such expositions as Century 21 and declared such to be a public pur-

pose. By the enactment the legislature providently provided for appropriate, reasonable, and economic municipal use of the grounds and facilities following conclusion of an exposition. The legislature, thus visualizing that cities of the class and population of Seattle could and probably would acquire multiple use properties uniquely capable of being developed as a civic center, followed up with the enactment of Laws of 1965, ch. 132, § 1 (RCW 35.22.305), which provides:

> The legislative authority of any city of the first class of more than four hundred thousand population shall have, notwithstanding any charter or statutory provision to the contrary, authority by ordinance to create a separate department of municipal government for the administration, management and control *of any multiple use city property*, including improvements thereon, devoted to educational, cultural, recreational, entertainment, athletic, convention and such other uses as shall be declared by ordinance to be incident to a civic center. The supervision of said department shall be by a manager, board or commission . . . and perform such duties as may be prescribed by ordinance which may include authority to . . . *operate, manage and control municipal off-street parking and public transportation facilities heretofore or hereafter erected primarily to serve such civic center. All expenditures, purchases and improvements made or performed by or under the direction of said department shall be subject to applicable charter provisions and statutes.* (Italics ours.)

The legislature thus recognized the need and desirability of public transportation facilities as a complement to a successful civic center. In so doing, it is reasonably certain that the legislature was aware of the provisions of RCW 35.22.280(6) and RCW 8.12.030, which respectively provide:

> Any city of the first class shall have power:
>
> . . . .
>
> (6) To purchase or appropriate private property within or without its corporate limits, for its corporate uses, upon making just compensation to the owners thereof, and to institute and maintain such proceedings

as may be authorized by the general laws of the state for the appropriation of private property for public use; . . . . RCW 35.22.280(6)

Every city and town and each unclassified city and town within the state of Washington, is hereby authorized and empowered to condemn land and property, including state, county and school lands and property for streets, avenues, alleys, highways, bridges, approaches, culverts, drains, ditches, public squares, public markets, city and town halls, jails and other public buildings, and for the opening and widening, widening and extending, altering and straightening of any street, avenue, alley or highway, and to damage any land or other property for any such purpose or for the purpose of making changes in the grade of any street, avenue, alley or highway, or for the construction of slopes or retaining walls for cuts and fills upon real property abutting on any street, avenue, alley or highway now ordered to be, or such as shall hereafter be ordered to be opened, extended, altered, straightened or graded [enumerating other examples], *and to condemn land and other property and damage the same for such and for any other public use* after just compensation having been first made or paid into court for the owner in the manner prescribed by this chapter. (Italics ours.) RCW 8.12.030.

Within the framework and context of these statutes, we are convinced that the legislature not only envisioned that the city of Seattle could and probably would acquire the existing monorail system as an adjunct to the Century 21 Exposition grounds, but also that the legislature intended, if such acquisition came about, that the city would be vested with the power to purchase or condemn, if required, such private easements or property as were appurtenant to and necessary to the continued maintenance, operation, and control of the system in conjunction with the civic center. The narrow and restrictive interpretation of RCW 8.12.030 urged upon us by relators would clearly seem to thwart or defeat what otherwise appears to be the manifest legislative intent of RCW 35.60 and RCW 35.22.305.

We accordingly hold that the city is vested with the power to condemn the easement in issue.

Relators, by their second contention, assert that the city has failed to demonstrate the public need and necessity for a permanent monorail easement over their property. In support of this contention, relators argue that the monorail system was originally conceived as a temporary adjunct to the Century 21 Exposition and that subsequent developments do not warrant or require continued operation of the system upon a permanent basis.

Again we must disagree with relators.

The evidence presented by the city amply demonstrates that the civic center which has emerged from the Century 21 Exposition and the grounds, buildings, and facilities devoted to that enterprise fulfills a distinct and most worthwhile public and community need. The center with its exhibition halls, opera and playhouses, coliseums, stadium, museum, science center, armory, amusement area, and landscaped grounds has become the focal point for a broad spectrum of public activities. Thousands of people visit the area on weekends and attend the various events scheduled during the week. The evidence indicates that as many as 50,000 persons have visited the center during the course of one day. Many of the visitors utilize the monorail system in traveling to and from the center, the evidence revealing that more than a million passengers were transported on the monorail system during the 8-month period from May through December, 1965. The evidence further demonstrates that but for the monorail system, the vehicular traffic congestion engendered by the volume of visitors would be extreme and virtually unmanageable. The evidence does not suggest in any way that either the community services furnished by the civic center or the public patronage will materially diminish in the foreseeable future. Neither does the evidence seriously suggest that discontinuance, dismantling, or relocation of the monorail system as an adjunct of the civic center is practical or predictable.

Public transportation has long been recognized as a public use within the contemplation of the power of eminent domain. *State ex rel. McIntosh v. Superior Court*, 56

Wash. 214, 105 Pac. 637 (1909). And a reasonable public need for a service satisfies the requirement of public necessity. *Tacoma v. Welcker, supra.*

We are convinced the evidence presented in the instant case fully supports the trial court's adjudication of public use and necessity.

By their third contention relators maintain that the city is estopped from condemning the easement in issue by the provisions of the lease agreement granting the temporary aerial easement. They predicate this contention upon provisions of the lease to the effect that the lessees, the city's assignors, would refrain from initiating condemnation proceedings.

■ Aside from the fact that other provisions of the several easement documents clearly contemplate and take note of the fact that eminent domain proceedings may take place, we are satisfied that the city is not estopped by the provisions relied upon by relators. This is so because a municipality cannot surrender or barter away the power of eminent domain, nor can it bind itself to a restricted exercise thereof. *State ex rel. Lincoln v. Superior Court,* 111 Wash. 615, 191 Pac. 805 (1920); *State ex rel. Henry v. Superior Court,* 155 Wash. 370, 284 Pac. 788 (1930); *State ex rel. Polson Logging Co. v. Superior Court,* 11 Wn.2d 545, 119 P.2d 694 (1941); 29A C.J.S. *Eminent Domain* § 4 (1965); 11 McQuillin, Municipal Corporations § 32.14 (3d ed. rev. 1964).

Finally, and as a part of their third contention, relators contend the trial court erroneously refused to admit into evidence certain documents containing various provisions relied upon by relators in support of their theory of estoppel. The trial court rejected the proffered exhibits upon the basis that their relevance bore upon the issue of damages rather than upon the issues of public use and necessity. The trial court, then, in its order of public use and necessity, preserved relators' right to litigate the applicability of the exhibits in the subsequent proceedings. We find no error in the trial court's ruling.

638

The order adjudicating public use and necessity is affirmed. The writ of certiorari is dismissed.

FINLEY, C. J., DONWORTH and WEAVER, JJ., and POYHONEN, J. Pro Tem., concur.