# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CITY OF REDMOND, a municipal
corporation of the State of Washington,

    Respondent,

    v.

UNION SHARES, L.L.C., a Washington
limited liability company;

    Appellant,

PUGET SOUND ENERGY, INC., a
Washington corporation, on its behalf and
as successor in interest to PUGET
SOUND POWER & LIGHT COMPANY, a
Washington corporation; CAMPBELL
LUMBER COMPANY, a Washington
corporation; KING COUNTY, a political
subdivision of the State of Washington;
and all other persons or parties known or
unknown or unknown heirs claiming and
rights, title, estate, lien or interest in the
real estate described herein;

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 75463-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 31, 2017

APPELWICK, J. — The City condemned an easement over Union Shares'

land outside the city boundaries in order to reroute a stream. Union Shares argues

that the condemnation is not a sufficiently public use, because it benefits other

private landowners. And, it argues that the City does not have statutory authority

to condemn the land because relocation of the stream is not a park use. We affirm.

FACTS

Union Shares owns a 39 acre rural property in the city of Redmond (City). In 2000, it sold an easement to the City for a recreational multi use trail. The trail runs near, but not immediately next to, Evans Creek. Instead, Evans Creek currently runs through several industrial properties near Union Shares' property. The City seeks to move the stream from the industrial properties, and onto a portion of Union Shares' property. This will place the Creek in proximity to the existing trail.

The genesis of this project was a 2005 study, commissioned by the City, regarding the stream relocation. That study's executive summary stated as follows:

> The proposed relocation routes will relocate Evans Creek further away from the commercial and industrial sites by moving the creek from the channelized, developed and relatively unshaded location, onto City and privately owned property east and north of the current creek location, accomplishing most of the WRIA [(Water Resource Inventory Area)] 8 recommended actions. The proposed routes will include tree and shrub plantings along the stream banks in order to provide increased shaded length over the exiting creek location. By moving the creek out of the industrial area and providing more natural cover, stream temperatures will likely be reduced. Stream enhancements along the entire length of both proposed routes, including LWD [(Large Woody Debris)], in addition to plantings, will help to restore riparian habitat. The channel will likely be allowed some room for migration over most of its new length which will allow a more natural alignment to be formed.

A senior planner from the City testified that this 2005 feasibility study was commissioned as part of a Chinook salmon conservation plan.

In 2014, the City identified three potential alternatives. Alternative 1 was to do nothing, and leave the stream in its current form. Alternative 2 would restore

the stream in place. Alternative 3, the "owner participation alternative," would relocate the stream and assist nearby owners with filling the former creek bed. The City conducted meetings with the industrial landowners in 2013 and 2014.

The City selected the owner participation alternative as its preferred alternative. This will involve the City coordinating with the industrial landowners to obtain the permits necessary to fill the empty creek bed that will result from the relocation. City planning materials acknowledged and highlighted the potential benefits that this will have for the industrial landowners: "[T]he project has broad support because it also benefits the industrial properties by creating the opportunity to fill the old stream channel and consolidate industrial uses away from the new stream channel." With the cooperation of the industrial landowners, the City will seek to fill the former stream channel, and offset this fill by installing new stream buffers on certain areas of their property.

The City filed a petition for condemnation of Union Shares' land, which the trial court granted after an evidentiary hearing. Union Shares appeals.

## DISCUSSION

Union Shares makes two arguments. First, it argues that the condemnation of its land is not for a public use. Second, it argues that the project does not qualify as a public park, and therefore the City did not have statutory authority to condemn Union Shares' land. It also requests attorney fees.

I.    Public Use

Union Shares first argues that the condemnation is not for a public use, and therefore outside of the City's eminent domain power.

The power of eminent domain is an inherent power of the state. State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wn.2d 811, 816, 966 P.2d 1252 (1998) (Convention Ctr.). This power is limited by both the Washington State Constitution and by statute. Id. at 816-17. Article I, section 16 prohibits the State from taking private property for private use. Id. at 817. RCW 8.04.070 requires that a proposed condemnation be necessary for the public use. Id.

Washington courts have developed a three-part test to evaluate eminent domain cases. Id. For a proposed condemnation to be lawful, the State must prove that (1) the use is public; (2) the public interest requires it; and (3) the property appropriated is necessary for that purpose. Id. Of these three requirements, Union Shares contests only the first element, that the use is public. A trial court's decision on public use will be reversed if the finding is not supported by substantial evidence. City of Blaine v. Feldstein, 129 Wn. App. 73, 79, 117 P.3d 1169 (2005).

Union Shares relies primarily on two key cases for its argument that the use here is not sufficiently public. First, it relies on In re Petition of City of Seattle, 96 Wn.2d 616, 638 P.2d 549 (1981) (Westlake I). Westlake I addressed the City of Seattle's use of eminent domain in planning its Westlake mall redevelopment. Id. at 618. The plans required Seattle to acquire all properties necessary for the project, and transfer them to the Westlake Development Authority. Id. at 622. The court held that Seattle did not have authority for the condemnation, because the proposed project contemplated a predominantly private, rather than public use. Id. at 629. The court noted that when a project's private use and public use cannot

be separated, eminent domain is not justified. Id. at 627. And, the Supreme Court relied on the trial court's finding that the retail aspects of the project were essential to its functioning. Id. at 628. Thus, the private aspects of the project barred the taking. Id. at 629. But, the court explicitly noted that "[w]ere these private uses only incidental to the public uses for which the land was condemned, a different question would be presented."[1] Id. at 634.

And, that different question was presented in Convention Ctr., the second key case that Union Shares cites on this issue. Convention Ctr. involved an effort to expand the Washington State Convention and Trade Center (Convention Center). Id. at 813. The Convention Center's existing exhibit space was four stories above ground. Id. at 814. The plans called for the creation of new exhibition space four stories above ground so that the new space would be contiguous with the existing space. Id. Some of the resulting space below the new addition would be developed for private retail by a private developer, Hedreen. Id. at 814-15. The Convention Center sought condemnation of private property to allow for the expansion. Id. at 815. The property owners challenged the condemnation on grounds that the State was condemning property for private use, pointing to the resulting space below the expansion to be sold for private use. See id.

The property owners argued that Westlake I should control, and that the condemnation was not sufficiently public in nature. Id. at 817. The Supreme Court

---

[1] The Supreme Court upheld a reformulated Westlake project in a second case, after the private aspects had been removed from the plans. See In re City of Seattle, 104 Wn.2d 621, 625, 707 P.2d 1348 (1985).

disagreed. Id. at 818. The court noted that the Westlake I plan called for condemnation and subsequent sale to private parties. Id. But, it distinguished the Convention Center expansion, because the private retail aspect was an independent, secondary use:

> The independence of the two projects is evidenced by the fact that if this court were to find for the property owners, the State could condemn the same land for the north expansion absent Hedreen's participation. Without the private development, the State could build the same exhibit hall, on the same property, hovering at the fourth story level on the same support columns. The project could go forward without private participation in entirely the same manner, except that three stories of vacant space would lie unused underneath the structure. Thus, the private development in this vacant space is a separable component of the expansion project. Hedreen's participation is a means to an end, but it is not an end in and of itself.

Id. at 820 (footnote omitted). Thus, the State's willingness to cooperate with private parties to maximize the outcomes that inevitably result from the public use did not render the use nonpublic.

Convention Ctr. controls here. The City seeks to move the stream. As reflected by the 2005 study, the project was instigated by the City's desire to restore Evans Creek, in large part because of the consequences for salmon runs. The result of the City's plan will leave an abandoned creek bed on the industrial neighbors' property. The City has agreed to coordinate with and assist these landowners in filling that area. About eight years after the 2005 study, in 2013 and 2014, with the assistance of project consultants, the City conducted meetings with affected industrial property owners, but not with Union Shares. The creek relocation could, and likely would, go forward without the City assisting the

industrial landowners. But, like in Convention Ctr., the City has elected to maximize the outcomes from the project, here by assisting the industrial landowners.[2]

Union Shares also points to portions of the record that show the City acknowledging potential benefits to the industrial landowners, and argues that assisting these private landowners was in fact the purpose of the project. For example, the feasibility study notes that "[r]elocating the creek further away from the current developed industrial and business sites will provide increased potential for further development and/or redevelopment while at the same time providing the required stream buffer areas." The city ordinance that provided for the condemnation notes that the relocation "will also encourage economic redevelopment of those properties currently encumbered by the stream." But, the sources of evidence that Union Shares points to do not establish that the effects of the relocation—potential private economic benefit—are inseparable from the public purpose of the project. City witnesses testified that the motivation for the project was salmon conservation and stream improvements.

---

[2] Union Shares also cites Manufactured Housing Communities of Washington v. State, 142 Wn.2d 347, 13 P.3d 183 (2000). There, the Supreme Court held unconstitutional a statute that gave a right of first refusal to a mobile home tenant when the owner seeks to sell the property. Id. at 351, 374. The court determined that the statute resulted in solely private use. Id. at 373. Union Shares argues that this case should control here, because the City is transferring the encumbrances of the stream restrictions from the industrial owners' property to Union Shares' property. But, unlike Manufactured Housing, there is an obvious public use contemplated here: enhancement of an existing public trail. This case is distinguishable.

Union Shares also notes that the City conducted meetings with affected landowners, but did not include Union Shares in those meetings. This, it claims, shows that the true purpose of the project is private development. But, the failure to engage Union Shares for certain aspects of the project does not establish a private purpose. Rather, as both the trial testimony and exhibits show, the project was, at the outset, driven by environmental concerns such as stream habitat. That the City engaged certain affected landowners some eight years later to discuss planning and impacts, without Union Shares, does not establish a private purpose.

The following exchange, during the cross-examination of City of Redmond Engineer Michael Haley, encapsulates the City's relationship with the industrial landowners:

Q: In fact, haven't the industrial property owners already signed permit applications?

A: Yes.

Q: For that purpose that we just discussed?

A: For our -- yes.

Q: For the over-all permitting, which includes -- for the over-all permitting which includes the fill of the old channel?

A: Yes.

THE COURT: Have they signed permits or have they agreed to do the buffering that you proposed, that green buffering?

THE WITNESS: In concept, yes.

Q: That is part of the owner participation alternative that they are agreeing to?

A: Yes.

Q: Now, after those overall permits would be granted, then as things move forward [and] the industrial property owners want to redevelop, then they would come to the City to obtain a City permit for filling in the channel; is that right?

A: That is our proposal, yes.

Q: Then they would have to pay for filling the channel after obtaining the City permits?

A: The expense of that, yes.

Q: The concept of the owner participation preferred alternative is that the City is going to obtain State, Federal and County permits, potentially, for filling in the old channel?

A: Correct.

THE COURT: What I am getting from this, folks, is that it is something that the City wants, it is something that the City is trying to on [sic] organize as part of the planning for this project but it is not necessary to this project.

That is what I am getting out of the overall.

MR. KLINGE: It is part of the project, because they have the property owners have signed [the] permit application.

THE COURT: Agreed.

That is clearly what the City is intending, at least from Mr. Haley they will go forward of [sic] Evans Creek relocation, whether or not they get these folks to go through on the agreement to get the permits and do the fill.

THE WITNESS: Is that a question to me?

THE COURT: Yes. Am I right?

THE WITNESS: Yes, that is true.[3]

---

[3] The trial court also noted that it was not convinced that the fill of the industrial property would even be a benefit to the industrial landowners: "There will be a private benefit, it seems. Although, I will tell you, frankly, I question who is benefiting most from what the industrial parties in this case are being asked to do."

In its planning process, the City engaged nearby landowners and offered to assist them in mitigating the effects of the project. And, the City acknowledged that, "[i]n doing so," the project might result in economic benefit for those landowners. But, Redmond's engagement with and support of private stakeholders that are affected by the public project does not render this project a non public use. Union Shares has not established that the private benefits were not inseparable from the public purpose of the project.

Substantial evidence supports the trial court's finding that the City's condemnation of Union Shares' land was for public use.

II.    Statutory Authority to Condemn Outside City Limits

Union Shares also contends that the stream relocation here does not qualify as a public park. Therefore, the City does not have the statutory authority to condemn its land, outside the Redmond city limits.

The power of eminent domain is an inherent power of the state. City of Tacoma v. Welcker, 65 Wn.2d 677, 683, 399 P.2d 330 (1965). A municipality may exercise this power only when it is expressly so authorized by the state legislature. Id. Although courts generally construe grants of municipal authority liberally, we generally employ a narrow construction to municipal exercises of the eminent domain power. City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn.2d 679, 694 n.8, 743 P.2d 793 (1987). Similarly, courts strictly construe the delegation of eminent domain powers. See Westlake I, 96 Wn.2d at 631. Statutory construction is a question of law, which courts review de novo. Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 569, 980 P.2d 1234 (1999).

RCW 8.12.030 lists a number of purposes for which a city may condemn land <u>within</u> city limits. It also lists certain purposes for which a city may condemn land "within or without" a city's limits. <u>Id.</u> Public parks is one of the purposes for which a city may condemn land outside city limits. <u>Id.</u>

In 2000, the City purchased an easement from Union Shares for construction of a recreational trail through its property. But, the multipurpose trail is not located immediately next to the Creek. As a senior engineer from the City testified, the planned relocation of the Creek closer to the trail will give the stream at least 100 feet of total buffer width, which will allow for habitat and add a flood plain. He also testified that it will move the Creek further from industrial properties that contaminate the Creek. The City believes that moving the Creek closer to the trail will add a passive recreation element to trail users, allowing them to observe and experience the habitat created by the new channel.

Union Shares argues that these plans do not amount to a public park. It notes that the plans will not open up any additional area to recreation, and instead will merely add passive features to the existing trails, which it argues should be insufficient. Effectively, it asks this court to find that stream relocation for habitat improvement near an existing multipurpose trail does not qualify as a public park.

The trial court viewed the evidence as supportive of a park use:

> Because what is proposed here in terms of the condemnation action is a link-up between an existing area through which the stream flows, which is Martin Park, and its continuation along a recreational trail, which looks darn park-like to this court by any modern definition, which is to be planted in a way that may be even more park-like with a hundred foot buffer on either side to provide that the users of this trail will essentially be in a park-like environment able to overlook the

11

stream and see the other things that are attracted by a protected stream, like fish and local wildlife and native vegetation.

Few cases have addressed what is and is not a public park under RCW 8.12.030. But, in In re Condemnation of Property for Improvement of Discovery Trail, 119 Wn. App. 628, 634-35, 82 P.3d 259 (2004), the court addressed a comparable scenario. Long Beach filed suit to condemn land outside of the city to build a multipurpose trail. Id. at 630. The court held that the trail "falls within the statutory definition of 'park' because the City is constructing and maintaining the Discovery trail for aesthetic and recreational purposes." Id. at 634. It also cited Webster's Third New International Dictionary's definition of "park" as " 'a tract of land maintained by a city or town as a place of beauty or of public recreation.' " Id. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1642 (1969)). It noted that the trail will allow users to "enjoy views of the dunes, the beach, and the ocean as they move along the trail or stop to gaze." Id. at 635; see also Blaine, 129 Wash. App. at 78 (holding that condemnation for a boardwalk was for a statutorily authorized public use, in part because a "boardwalk is like a park, as it allows the public to access scenic views").

The park elements here parallel those in Discovery Trail.[4] Redmond is relocating the Creek to improve salmon habitat, and to enhance the experience of trail users. By moving the Creek and riparian habitat closer to the trail, the users will have greater opportunities to observe and experience the natural surroundings.

---

[4] The Discovery Trail court applied a liberal construction in its statutory analysis. Id. at 635. Union Shares argues that this was erroneous. But, we need not address this argument, because we hold that adding riparian habitat and wildlife viewing opportunities to the trail is a public park usage under either a narrow or liberal construction of the statute.

12

The trial court correctly concluded the proposed use was a park use. In accordance with <u>Long Beach</u> and <u>Blaine</u>, we hold that the condemnation is within the City's RCW 8.12.030 authority to condemn land outside of the city limits for a public park.[5]

We affirm.

WE CONCUR:

_____

_____  
Trickey, ACJ

_____

---

[5] Union Shares requests attorney fees under RCW 8.25.075(1)(a), which states that a condemnee is entitled to attorney fees if the condemnee successfully defeats a condemnation action. But, because we rule in favor of the City, Union Shares is not entitled to attorney fees.